538 So.2d 409 (1989)
KAISER INVESTMENTS, INC.
v.
LINN AGRIPRISES, INC.
No. 57967.
Supreme Court of Mississippi.
January 11, 1989.
Rehearing Dismissed February 9, 1989.
*410 James E. Upshaw, Tommie G. Williams, and Lonnie D. Bailey, Upshaw, Williams, Biggers, Page & Kruger, Greenwood, for appellant.
Ralph Chapman, Chapman & Heaton, Clarksdale, for appellee.
EN BANC.
ROY NOBLE LEE, Chief Justice, for the Court:
Kaiser Investments, Inc. (Kaiser) brought suit in the Chancery Court of Sunflower County against Linn Agriprises, Inc. (Linn) for the outstanding balance due on a note given by Linn to Kaiser in consideration for Kaiser's financing Linn's farming operations. The chancellor granted Linn's motion to transfer the action to the Circuit Court of Sunflower County, since the matter could be "easily handled by a jury." Linn answered and counterclaimed for lost profits and other damages arising from Kaiser's alleged breach of an agreement to rent land to Linn and extend further crop *411 financing. The jury returned a verdict for forty-five thousand dollars ($45,000) in favor of Kaiser and for one hundred fifty thousand dollars ($150,000) on Linn's counterclaim. Kaiser moved alternatively for additur of its verdict and for remittitur of Linn's verdict, or for a new trial. Motion for additur was denied, and the court ordered a remittitur of fifty thousand dollars ($50,000) on Linn's verdict or a new trial. Linn declined to accept the remittitur, and at the new trial on the counterclaim, the jury returned a verdict of one hundred fifty-six thousand dollars ($156,000) for Linn. Kaiser made the same post-trial motions as before, and all were overruled. Kaiser has appealed from the judgments in both trials and assigns eight (8) errors in the trials below.

FACTS
Kaiser, a Mississippi corporation, owns some fourteen hundred (1,400) acres of farmland in Sunflower County known as the Halstead Place. In 1981 this land was leased to William G. "Chubby" Jefcoat, a farmer from the Linn community, about six miles southwest of Ruleville. This land was leased on a crop-share basis, i.e., entitling the lessor to a stated percentage of the crop proceeds in lieu of cash rent. Jefcoat planted cotton, soybeans, rice, and wheat and realized a net loss of around $20,000 on his 1981 farming operations.
The lease was renewed in 1982. Before the expiration of the 1982 term, the lease was mutually rescinded, and a new lease was entered into between lessor Kaiser and lessee Linn, a Mississippi corporation formed by Jefcoat. As in the previous year, the lease was on a crop-share basis. Kaiser financed Linn's 1982 farming operation in the amount of $253,000 evidenced by promissory notes given by Linn and by Jefcoat personally. Linn's 1982 harvests were sufficient to allow repayment of $208,000 of the Kaiser loan, leaving an outstanding principal balance of $45,000 owing to Kaiser for the 1982 crop financing.
On November 1, 1982, Kaiser advanced $20,000 to Linn for the 1983 crop which was again to be comprised of cotton, soybeans, rice and wheat. At this point, the parties had not renewed the lease on the Halstead Place for 1983. Linn used a portion of this $20,000 advance to plant 160 acres of wheat for harvest in 1983.
On February 9, 1983, Kaiser decided that it would be imprudent to loan Linn any further funds due to Linn's record of losing money on the two previous crops. One of the chief considerations in Kaiser's decision was the fact that, while 1982 had been a record year for cotton in Sunflower County, Linn averaged only 529 pounds of cotton per acre against a county-wide average of 786 pounds per acre. Kaiser advised Linn that it could remain on the Halstead Place and that the lease would be renewed for 1983 if Linn could obtain crop financing elsewhere within ten days. Linn was unable to do so, and on March 21, 1983, Kaiser filed suit in the Chancery Court of Sunflower County to eject Linn from the Halstead Place, for discovery and accounting of Linn's financial status, cancellation of any purported lease for 1983, and for judgment against Linn for the unpaid balance of the notes. Kaiser subsequently leased the Halstead Place to other farmers. The wheat planted by Linn had come to a stand, but it was disced up by the new tenant.
In July of 1983, Chubby Jefcoat and his wife filed their petition for bankruptcy. As a result, Jefcoat lost all the farming equipment used on the Halstead Place. This equipment was owned personally by Jefcoat but used exclusively by Linn. The right to the exclusive use of this equipment was apparently Linn's only asset; thus Jefcoat's personal bankruptcy left Linn basically worthless.
Kaiser showed that at the time of trial the outstanding balance on Linn's notes, including interest and attorney's fees calculated according to the terms of the notes, was $98,072.34. Chubby Jefcoat testified for Linn as to his detailed plans for farming cotton, soybeans, rice, and wheat on the Halstead Place on 1983, and the profits he projected for that year. These projections took into account two variables, yield per *412 acre and market price. Jefcoat projected a gross income for Linn of $284,532 and a net profit of $29,491.
The Sunflower County Agent testified that Jefcoat's projections were reasonable. To the contrary, the State Cotton Specialist for the Mississippi Cooperative Extension Service testified for Kaiser that Jefcoat's projections were improbable. He further testified that he was in a better position to review crop projections than was the county agent. The head of the Mississippi Cooperative Extension Service Agricultural Economics Department testified that based upon Extension Service statistics, Linn's 1983 crop plan would have resulted in a substantial net loss.
Kenneth Mallette, one of the tenants who farmed the Halstead Place in 1983, testified for Kaiser that Linn's 1983 plan for cotton was too ambitious and that although he (Mallette) made a $14,000 profit on cotton in 1983, he would have made less if he had farmed according to Linn's plan. Another 1983 tenant of the Halstead Place, Jimmy Michael Hammers, testified that he lost $20,000 on his soybean crop that year.
An additional element of damages alleged by Linn in its counterclaim was loss of certain government benefits. Neither the record nor the briefs develop this point very clearly, but the benefits in question were apparently the Federal price support payments provided by 7 U.S.C. § 1421, et seq. The program referred to in the record and briefs as "Payment in Kind" (PIK) and "Diversion" compensate farmers for agreeing to let designated acreage lie fallow instead of farming it. The program referred to as "Deficiency" pays farmers the difference between a preset or "target" market price and the price actually realized by farmers if less than the target price. Jefcoat did not take these price supports into consideration when calculating the projected 1983 profits for Linn. There was testimony that Kaiser received $39,296 in PIK benefits in 1983. The amount of deficiency and diversion payments claimed by Linn appears to be $14,563.09. All of these price supports were paid by the federal government directly to Kaiser. The executive director of the Sunflower County Agriculture Stabilization and Conservation Service testified that under the facts of this case, Linn would not have been entitled to any price support payments for 1983 because it did not conduct any farming operations that year.

LAW

I.

THE LOWER COURT ERRED IN DENYING KAISER'S MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR AN ADDITUR ON KAISER'S CLAIM AGAINST LINN FOR THE UNPAID BALANCE OF THE 1982 CROP LOAN.
The evidence was uncontradicted that Linn and Jefcoat signed three (3) notes in favor of Kaiser in the amount of two hundred fifty-three thousand dollars ($253,000) for financing on the 1982 crop; that Linn paid two hundred eight thousand dollars ($208,000) on those notes; and that on the date of trial Kaiser's claim, which included the balance of the notes, interest and attorney's fees, was ninety-eight thousand seventy-two dollars thirty-four cents ($98,072.34). Kaiser contends that the lower court should have granted its motion for judgment notwithstanding the verdict, or, in the alternative, an additur to increase the verdict to $98,072.34. Linn contends that the $45,000 verdict represents a jury setoff of price support benefits against the unpaid balance of the notes, i.e., $98,072.34, less $53,859.09. However, the jury was not instructed to set off any damages against Linn's debt on the notes, and the issue of Linn's entitlement to price support benefits was confined by the instructions to Linn's counterclaim. The jury was instructed to return two verdicts, one on Kaiser's direct claim and another on Linn's counterclaim. Further, it is doubtful that the evidence would have supported a setoff had the jury made one.
Where the evidence clearly shows that the maker is indebted to the payee on a note, but the jury returns a verdict for the defendant, such verdict is erroneous *413 and must be set aside. Dobbs-Maynard Company, Inc. v. Jumper, 388 So.2d 879 (Miss. 1980). Likewise, where the maker's indebtedness on a note is clearly shown by the evidence, any verdict for the defendant less than the proven amount is erroneous. Campbell v. Kelley, 719 S.W.2d 769 (Mo. 1986).
Since the uncontradicted evidence showed that Linn signed the notes totalling $253,000; that $208,000 of this principal was repaid; and that the remaining unpaid balance, including interest and attorney's fees calculated according to the terms of the notes, was $98,072.34, we are of the opinion that Kaiser was entitled to judgment for the full amount of the unpaid balance proven and that the jury should have been peremptorily instructed accordingly. Salitan v. Ford, 231 Miss. 616, 97 So.2d 232 (1957).
The lower court erred in overruling Kaiser's motion for judgment notwithstanding the verdict and the judgment of the lower court is reversed and judgment is rendered here in the sum of $98,072.34 in favor of Kaiser.

II.

THE LOWER COURT ERRED IN DENYING KAISER'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON THE COUNTERCLAIM OF LINN.
On its counterclaim, Linn sought to show (1) the existence of an agreement between it and Kaiser Investments to farm the Halstead Place in 1983; (2) breach of that agreement; and (3) damages. Kaiser contends that it was entitled to judgment notwithstanding the verdict on Linn's counterclaim because Linn failed to prove the first and second elements named above.
Kaiser argues that the parties had executed written detailed lease agreements for the years 1981 and 1982, but that no such written agreement was executed for 1983. However, the record reflects correspondence between the parties from November 1, 1982, to January 5, 1983, relating to the 1983 Halstead place operations. On November 1, 1982, Kaiser wrote a letter to Linn in the form of an agreement providing spaces for the signatures of the parties. See Appendix I. It states that the 1983 crop plan for the Halstead place has been "determined" and discusses the storage of the rice and soybeans to be harvested in 1983. It further states, "[s]ince it is of great importance for both parties to have as much field work done in the fall for the 1983 crop and also to plant 212.7 acres of wheat, Linn Agriprises, Inc. should receive the first advance of the 1983 crop expense money." In accordance with that document, Linn signed a note in favor of Kaiser for $20,000 and executed a security agreement pledging the 1983 crops as collateral. The security agreement recites that the collateral given therein should be sufficient to cover future advances to Linn not to exceed $230,000.
A contract implied in fact is an obligation arising from a mutual agreement and intent to promise, but where the agreement and promise have not been fully expressed in words. Cooke v. Adams, 183 So.2d 925 (Miss. 1966); 1 Williston The Law of Contracts, § 3, p. 11 (1957). It is obvious from the correspondence and transactions that the parties would not have agreed that it was "of great importance" to Linn to get an early start on the 1983 crop, if they had not intended to farm the Halstead Place in 1983. Surely Kaiser would not have required Linn to give unplanted crops as security, if it had not intended Linn to plant, raise and harvest the crops in 1983. Further, there would not have been any reason for Kaiser to allow for additional crop financing under the terms of the security agreement, if it had not contemplated further advances for Linn's 1983 farming operations.
Kaiser takes the position that any agreement to lease the Halstead Place to Linn for 1983 was contingent upon two conditions, i.e., (1) Linn had to satisfy its 1982 debt to other creditors and (2) Linn had to reduce to $40,000 its 1982 financing debt to Kaiser. Only Kaiser's managing agent testified to those facts and there is no documentation of them in the record. Linn's *414 president, Chubby Jefcoat, denied the existence of any such conditions.
The jury was presented sharply conflicting facts as to whether or not there was a mutual agreement between Kaiser and Linn and Kaiser's intent to lease the Halstead Place to Linn for 1983. "Conflicts in evidence are to be resolved by the jury, and, before a reviewing court can interfere with the verdict, testimony must so strongly preponderate that the court can safely say it was overwhelmingly in favor of the appellant." Rotwein v. Holman, 529 So.2d 173 (Miss. 1988); Jackson v. Griffin, 390 So.2d 287 (Miss. 1980). The question of credibility of witnesses is for the jury.
We are of the opinion that the lower court was correct in overruling Kaiser's motion for judgment notwithstanding the verdict on Linn's counterclaim and appellant's assigned Error II is rejected.

III.

THE LOWER COURT ERRED IN BOTH TRIALS IN ALLOWING TESTIMONY ELICITED ON BEHALF OF APPELLEE OF PURPORTED LOST PROFITS AS THE PURPORTED LOST PROFITS ARE TOO SPECULATIVE AND UNCERTAIN TO BE UTILIZED FOR THE PURPOSE OF ESTIMATING DAMAGES INCURRED BY LINN AGRIPRISES ON ITS COUNTERCLAIM.

IV.

THE LOWER COURT ERRED IN GRANTING INSTRUCTION # D-1A REQUESTED BY APPELLEE LINN AGRIPRISES IN THE SECOND TRIAL.

V.

THE LOWER COURT ERRED IN REFUSING INSTRUCTION # P-5 REQUESTED BY APPELLANT KAISER INVESTMENTS, INC., IN THE SECOND TRIAL.
Linn's evidence of damages on its counterclaim consisted entirely of detailed projections of the profits it would have made had it been allowed to farm the Halstead Place in 1983. Instruction D-1A told the jury, in pertinent part, that it should consider "loss of profits, if any, sustained by Linn Agriprises, Inc. for the crop year 1983... ." The lower court refused Instruction P-5 for Kaiser to the effect that "[y]ou are instructed that you may not consider loss of profits as an element of damages in calculating the amount of damages to be awarded to Linn Agriprises, Inc." Assigned Errors III and IV challenged the validity of anticipated loss of profits as a measure of damages under the facts of the present case.
This Court has previously authorized the use of such crop projections for determination of damages. Leard v. Breland, 514 So.2d 778 (Miss. 1987); Mid-Continent Aircraft Corp. v. Whitehead, 357 So.2d 122 (Miss. 1978). These cases are distinguished from the case sub judice in that the former deal with profits lost from injury to growing crops, while the latter deals with profits lost from the anticipated harvest of crops not yet planted. Leard v. Breland, supra, cites with approval Dunn, Recovery of Damages for Lost Profits (3d ed. 1987), which states:
Cases are split on whether breach of a lease of farmland will give rise to damages measured by the profits on the crop that would have been raised.... When lost profits measured by the value of a crop are held recoverable, damages may be calculated from evidence of average yields for the season on land in the vicinity or from yields on the same land in other years.
Id., at § 2.28, at 135-36.
Among the authorities cited by Dunn in support of use of profit projections for crops not yet planted, Nelson v. Reisner, 51 Cal.2d 161, 331 P.2d 17 (1958), states that such projections should be based upon "reasonable probability." 51 Cal.2d at 171-72, 331 P.2d at 24. Similarly, L.U. Cattle Co. v. Wilson, 714 P.2d 1344, 1348 (Colo. App. 1986), requires that crop projects be "reasonably ascertainable based on past experience."
*415 In Mizell v. Spires, 146 Ga. App. 330, 332, 246 S.E.2d 385, 387 (1978), the Georgia Court said:
[T]he anticipated profits of an unestablished future business are generally too speculative for recovery, but where the business has been established, has made profits and there are definite, certain and reasonable data for their ascertainment, and such profits reasonably must have been in the contemplation of the parties at the time of the contract, they may be recovered at least for a limited reasonable future time, even though they cannot be computed with exact mathematical certainty.
This Court has stated that damages for breach of contract must be proven with reasonable certainty and not based merely on speculation and conjecture. Leard v. Breland, supra; Lovett v. E.L. Garner, Inc., 511 So.2d 1346 (Miss. 1987).
The case sub judice is distinguished from Nichols v. Stacks, 485 So.2d 1034 (Miss. 1986), which involved recovery of the statutory penalty [(MCA § 95-5-3 (1972)] for willful destruction of trees. The Court said:
When the plaintiffs offered proof that in a precisely measured area all trees thereon had been destroyed and removed, and all signs thereof obliterated by the defendant; that they were familiar with the kind and size of the trees destroyed; that in an area immediately adjacent to the obliterated area the trees were of the same kind and size; that a sufficient portion of the adjacent area containing trees in the destroyed area had been precisely measured and the trees thereon actually counted so as to determine a fair ratio or comparison with the destroyed area, they offered as much evidence as they could have under the circumstances as to the number and kind of trees destroyed. They further offered sufficient evidence upon which a monetary award could be made under the statute. Such proof is beyond pure speculation or guess.
* * * * * *
Since, concededly, the best the plaintiffs or anyone else will be able to do under the circumstances of this case can be no more than a "fair and reasonable estimate," Cain [v. Mid-South Pump 458 So.2d 1048 (Miss. 1984)] supra, or a "just and reasonable inference," Story Parchment [Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931)] supra, the weight, credibility and worth of the comparative measurement or measurements and calculations upon rehearing in determining the amount of the monetary award will rest solely with the chancellor. We go no further at this time than to hold that an award in some amount under the statute is proper.
485 So.2d at 1037, 1039.
In the case at bar, only the wheat had been planted by Linn at the time of the alleged breach. Linn's president testified that this wheat would have yielded a gross profit of $13,693; the successor tenant of the Halstead Place disced up this wheat because some of it "wasn't too good." Linn's evidence was that if it had been allowed to plant cotton, soybeans and rice, these crops would have yielded an additional $270,839 in gross profits; one expert agreed with this projection and two disagreed. Also, one of the farmers who worked the Halstead Place after Linn was evicted testified that he lost $20,000 on his soybean crop. A final consideration is the fact that Linn's 1982 operations on the Halstead Place resulted in a $40,000 loss in the year in which other Sunflower County farms realized record crops.
We are of the opinion that Linn's lost profits for its unplanted 1983 crops are not reasonably ascertainable based on past experience. L.U. Cattle Co. v. Wilson, supra. Linn had not established itself as profitable, and, as is apparent from the conflicting opinions at trial, there is in this case no definite or certain data by which profits or losses for this unplanted crop might be estimated. Mizell v. Spires, supra. We are of the opinion that this is not a proper case for proof of lost profits from an unplanted crop and that evidence of the projected 1983 harvest should have been *416 excluded. Leard v. Breland, supra; Lovett v. E.L. Garner, Inc., supra.
It is undisputed that at the time of the alleged breach, Linn had planted some 160 acres of wheat and that the wheat had come to a stand. Thus, unlike the cotton, soybean, and rice crops for which Linn made profit projections, the wheat crop was growing at the time Linn was evicted from the Halstead Place.
This Court has held that in the case of growing crops, the computation [of lost profits] should be based, although not exclusively, upon the difference between the value of the crop immediately before and just after the damage; but such a rule must be given flexibility to allow consideration of pertinent practical factors dictated by fairness and reason, including the cost of cultivation, harvesting and marketing. Mid-Continent Aircraft Corp. v. Whitehead, 357 So.2d 122 (Miss. 1978).
Leard v. Breland, 514 So.2d at 782. Because Linn's 1983 wheat was a growing crop, Linn was entitled to offer proof of damages from the loss of its wheat crop in accordance with the guidelines of Leard v. Breland.
We are of the opinion that the lower court erred in admitting evidence of lost profits for projected income on the unplanted cotton, soybean and rice crops, and in instructing the jury that such lost profits could be considered. Linn was entitled to show damages for loss of a growing wheat crop.
Assigned Errors III, IV and V require that the judgment be reversed and remanded for further action consistent with this opinion.

VI.

THE LOWER COURT ERRED IN THE SECOND TRIAL IN REFUSING TO ADMIT EXHIBIT "ID-C" IN ITS ENTIRETY.
Kaiser attempted to introduce in evidence Exhibit ID-C, which was the joint petition for bankruptcy of Chubby Jefcoat, Linn's president, and his wife Melissa. The purpose of the exhibit was to evidence past failures of Jefcoat in farming before he incorporated his operations as Linn Agriprises, Inc. It reflected an indebtedness of over three hundred forty-three thousand dollars ($343,000) to Farmers' Home Administration for farm loans extended from 1975 to 1981. The lower court allowed parts of the petition into evidence, but much of the information contained therein, including the admission of indebtedness of FMHA, was excluded. Jefcoat's evidence on his counterclaim was that he, as president of Linn Agriprises, expected to earn a substantial profit on Linn's 1983 crop. Details of the bankruptcy petition tended to show that Jefcoat had been an unsuccessful farmer for a number of years.
Kaiser contends that the evidence of Jefcoat's personal bankruptcy was relevant to the issues at trial under Rule 401, Miss.R. Evidence. The lower court apparently excluded the evidence on Rule 403 undue prejudice grounds.
An important factor for consideration in determining lost profits is a party's proof of past profits. Lovett v. E.L. Garner, Inc., 511 So.2d 1346 (Miss. 1987); Sanders v. Dantzler, 375 So.2d 774 (Miss. 1979); Miss. Power & Light Co. v. Pitts, 181 Miss. 344, 179 So. 363 (1938). If a party can show lost future profits by evidence of past profits, the opposite party should be able to rebut the same with evidence of past losses. In the present case, Linn showed no past profits because it had none. Linn had farmed only one season previously and had experienced a net loss for that year. Chubby Jefcoat, whose personal farming operations were ultimately incorporated as Linn Agriprises, had several years' experience in farming, but he had experienced an overall net loss as indicated on his petition for bankruptcy and Exhibit ID-C.
In deciding the question in a similar case, the Utah Supreme Court adopted the language of the trial court regarding admissibility of evidence of bankruptcy where a personal injury plaintiff sought to show loss of future income:

*417 It seems to me that when she (plaintiff) puts on witnesses who testify about her sales ability and the fact that she was going to be such a big success and make a thousand dollars a month income, the evidence or fact that she just nine months before, while operating a similar type of business activity, ended up in the Bankruptcy Court, I think is material and relevant which the jury could consider as rebutting her claims as to her earning ability.
Bullock v. Ungricht, 538 P.2d 190, 192 (Utah 1975).
The Utah Supreme Court agreed with the trial court that the probative value of such evidence substantially outweighed the danger of any prejudice. Exclusion of evidence of probative value constitutes reversible error where the substantial rights of the appellant are prejudiced. Transcontinental Gas v. State Oil & Gas Board, 457 So.2d 1298 (Miss. 1984); Planters Bank v. Garrott, 239 Miss. 248, 122 So.2d 256 (1960).
We are of the opinion that evidence of Jefcoat's bankruptcy was highly probative on the issue of his profitability as a farmer and that a different verdict might have been reached had the jury been aware of his past losses. We, therefore, conclude that refusal to admit Exhibit ID-C constitutes reversible error.

VII.

THE VERDICT OF THE JURY IN THE SECOND TRIAL WAS CONTRARY TO THE LAW AND THE EVIDENCE, AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE, AND WAS SO EXCESSIVE AS TO BE UNREASONABLE, OUTRAGEOUS AND TO MANIFESTLY SHOW THE JURY TO HAVE BEEN ACTUATED BY BIAS, PASSION AND PREJUDICE.

VIII.

THE LOWER COURT ERRED IN ALLOWING COUNSEL FOR THE APPELLEE TO MAKE IMPROPER REMARKS DURING THE CLOSING ARGUMENT AND REFUSING TO INSTRUCT THE JURY TO IGNORE THE IMPROPER ARGUMENT AFTER HAVING BEEN REQUESTED TO DO SO BY COUNSEL FOR THE APPELLANT.
In light of our discussion of the assigned errors hereinabove, it is not necessary to address assigned Error VII.
Kaiser objected to the argument of counsel for Linn when he said: "It has been established that Linn Agriprises, Inc. owed Kaiser Investments, Inc. $45,000, and we are going to pay them when you return your verdict in this case." Counsel implied that unless the jury returned a verdict for Linn, it would not be able to pay its debt to Kaiser. A similar type argument has been held improper but not reversible error where the jury is admonished to disregard it. Savery v. Gray, 51 So.2d 922 (Miss. 1951) (not reported in state reports). In the case sub judice, the objection was overruled and there was no admonishment to the jury.
Upon retrial, the comment should not be repeated.

CONCLUSION
The Court holds:
(1) that the judgment of the lower court be reversed as to the direct claim of Kaiser and judgment in the sum of $98,072.34 is rendered for Kaiser;
(2) that the judgment of the Circuit Court of Linn Agriprises' counterclaim be affirmed as to Kaiser's liability for breach of an agreement to lease the Halstead Place to Linn for 1983;
(3) that the judgment of the lower court on Linn Agriprises' counterclaim be reversed as to Linn's damages for lost profits based upon income projections for crops *418 never planted and that the cause be remanded for a new trial on the sole issue of damages suffered by Linn as a result of the destruction of its growing crops, i.e., wheat; and for development and entitlement, if any, to federal price support payments on the 1983 crops; and
(4) that the ruling of the lower court on Linn Agriprises' counterclaim excluding certain evidence of Chubby Jefcoat's personal bankruptcy (Exhibit ID-C) be reversed.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART; REVERSED AND RENDERED IN PART.
PRATHER, ROBERTSON, SULLIVAN, ANDERSON, and ZUCCARO, JJ., concur.
DAN M. LEE and HAWKINS, P.JJ., dissent by separate opinion.
PITTMAN, J., not participating.
*419 
*420 DAN M. LEE, Presiding Justice, dissenting:
This case arrived before this Court after two trials in the court below. In the first trial, the jury returned a verdict on Kaiser's $98,072.34 claim for the outstanding balance due on several notes of $45,000 and of $150,000 on Linn's counter-claim for breach of contract. After Kaiser's motion for additur was denied, and after Linn declined to accept a remittitur, a new trial ensued; the second jury returned a verdict for Kaiser on the several notes of $45,000 and $156,000 for Linn's counter-claim. The majority of this Court now reverses the jury verdict of $45,000 and renders judgment for Kaiser of $98,072.34 on the notes, and reverses and remands for yet another trial on the sole issue of damages suffered by Linn as a result of Kaiser's breach of contract  an issue which has already been decided by two juries with similar result. I respectfully dissent.
As to Kaiser's claim for the balance of $98,072.34 due on the note, the evidence adduced at trial lent itself to four possible verdicts:
(1) $1,317 plus 20% attorney's fees;
(2) $11,300 plus 20% attorney's fees;
(3) $45,000, which Jeffcoat admitted owing before credits for PIK and diversion payments, and
(4) $98,072.34 contended to be owed by Kaiser.
It is important to remember that Jeffcoat and Kaiser agreed that Jeffcoat's portion of PIK and diversion payments would be applied to Jeffcoat's carryover debt from 1982. The question was whether to apply 30% in payments to the 1982 debt or 75% under new governmental regulations; it is apparent that the jury found that Kaiser breached the contract and collected all the governmental payments without giving any credit whatsoever to Linn. Evidence at trial indicated, and the jury found, however, that Kaiser breached the contract with Linn because Kaiser would not be able to obtain 75% of the government payments, but only 25%, due to change in governmental regulations requiring that the division of payments between landowner and farmer would be the same percentages as provided in the lease (in this instance, 75% to the farmer and 25% to the landowner). Be that as it may, Linn and Kaiser agreed to apply Linn's part of the government payments to the carryover debt from 1982. Kaiser should not be able to collect for both the balance due on the notes as well as to collect the government payments, all of which Kaiser was able to collect only as a result of breaching his contract with Linn, payments totalling $71,812.12. The jury was entitled to take all of this evidence into account, which it obviously did. The evidence showed that Kaiser received PIK and diversion payments totalling $71,812.12. Seventy-five percent of that amount, which Jeffcoat would have collected but for Kaiser's breach of contract is $53,959.09. Had this amount been applied to Jeffcoat's debt, which by agreement it should have been, the debt would have been reduced to $45,013.25. The jury's verdict of $45,000 for Kaiser was well within the evidence presented and should be affirmed under our oft-quoted scope of review of a jury's findings. See, e.g., Fitzner Pontiac-Buick-Cadillac v. Smith, 523 So.2d 324 (Miss. 1988):
[I]f there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.
Id. at 326. See also, Rester v. Morrow, 491 So.2d 204, 211-12 (Miss. 1986); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975).
As to the jury's verdict on Linn's counter-claim, there was evidence, excluding PIK and diversion payments, that Linn's damages due to Kaiser's breach of contract were as follows:

 $ 5,822.50 wheat
 $42,625.00 irrigated cotton
 $22,190.00 non-irrigated cotton
 $35,810.62 soybeans
 $11,355.37 rice
 ___________
 ___________
 $117,803.49 crop loss
 + 65,098.71 loss of equity in repossessed farm
 ___________
 ___________
 equipment
 $182,902.20

*421 Adding 75% of PIK and diversion payments that Linn lost, total damages amounted to $236,861.29. It is clear that neither jury included the PIK and diversion payments in its damage assessment, since they returned verdicts of $150,000 and $156,000. Therefore, it is equally clear that Linn was not compensated twice for the lost government payments, i.e., once as set-off from the debt to Kaiser and once as damages on Linn's counter-claim.
As to Linn's proof of damages on the counter-claim, the only method of proof available to him was the crop plan he had prepared for the 1982-83 crop year. Three experts testified as to the efficacy of the crop plan, such that the amount of damages became a jury question. Speculation and uncertainty of amount of damages is no bar to recovery of damages. As we stated in Merritt v. Dueitt, 455 So.2d 792, 793 (Miss. 1984):
The rule that damages, if uncertain, cannot be recovered applies to their nature, and not to their extent. If the damage is certain, the fact that its extent is uncertain does not prevent recovery.
It is certain that Linn suffered damage because of Kaiser's breach of contract in the nature of crop loss and equipment loss. Apropos to the factual scenario sub judice is our recent holding in Nichols v. Stacks, 485 So.2d 1034 (Miss. 1986):
In Cain v. Mid-South Pump Co., 458 So.2d 1048, 1050 (Miss. 1984), Justice Prather, speaking for the Court, further refined this rule in stating:
... [W]here it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages. This view has been sustained where, from the nature of the case, the extent of the injury and the amount of damage are not capable of exact and accurate proof. Under such circumstances, all that can be required is that the evidence  with such certainty as the nature of the particular case may permit  lay a foundation which will enable the trier of facts to make a fair and reasonable estimate of the amount of damage. The plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss. [Emphasis added]
As noted in Cain, and emphasized in Thomas v. Global Boat Builders & Repairmen, Inc., 482 So.2d 1112 (Miss. 1986), a plaintiff under this rule cannot ignore information, methods and procedures available to him whereby he can accurately prove the amount of monetary damages and make a jury issue simply by testimony that he did suffer property damage. On the other hand, a plaintiff who has unquestionably suffered a pecuniary loss, and has produced the best evidence available to him, should not be denied recovery because the amount cannot be ascertained with the same precision as an ordinary claim for damages. Under these circumstances he is only required to put on sufficient proof to enable the fact finder to reach a fair and reasonable estimate of the damages. Cain, supra. This rule has poignant application in such a case such as this. Not only did the employees of Stacks cause the damage, they removed the very evidence which would have enabled plaintiffs to determine the number of trees cut with any precision. As stated by the U.S. Supreme Court in Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652, 660 (1946):
It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would bean that the more grievous the wrong done, the less likelihood there would be of a recovery.
The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.
And, as also stated by the U.S. Supreme Court in Story Parchment Co. v. *422 Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544, 548 (1931):
In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result may be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise ... the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party.
We therefore conclude that sufficient evidence was presented for the chancellor to make an award in some amount under the statute. Because the chancellor did not weigh this evidence but rejected it entirely, we remand for his determination as to the amount of damages proved, under the above enunciated standard.
Id. 485 So.2d at 1038-39. There was certainly enough evidence here for the jury to make a fair and reasonable estimate of the amount of Linn's damages  which two juries did, within $6,000 of each other. Thus, the jury's verdict on Linn's counter-claim for $156,000 ought be upheld.
I would affirm.
HAWKINS, P.J., joins this dissent.