610 So.2d 340 (1992)
NEW HAMPSHIRE INSURANCE COMPANY
v.
SID SMITH & ASSOCIATES, INC. and Sidney E. Smith, Individually.
No. 90-CA-556.
Supreme Court of Mississippi.
December 3, 1992.
*341 Mark E. McLeod, Jackson, for appellant.
Thomas W. Sanford, Jackson, for appellee.
En Banc.
PITTMAN, Justice, for the court:
New Hampshire Insurance Company filed suit in Hinds County Circuit Court against Sidney Smith and his insurance agency, alleging that Smith had failed to timely pay $31,031.42, represented by a promissory note executed by Smith in favor of New Hampshire Insurance Company. Smith counterclaimed, alleging that when credits properly due him were considered, New Hampshire was in debt to him in the approximate amount of $11,000.00. A jury trial resulted in a verdict in favor of Smith in the amount of $11,000.00. New Hampshire Insurance Company appeals from the lower court judgment. Finding reversible error committed below, we reverse and remand this cause for a new trial.

I.
On October 19, 1979, Sidney Smith, d/b/a Sidney E. Smith Insurance Agency, executed an agency agreement with the New Hampshire Insurance Group, which consisted of several insurance companies, including the New Hampshire Insurance Company ("New Hampshire"). Smith would write an insurance policy and submit the pertinent information to New Hampshire. New Hampshire would then produce the policy and send it to the agent and to the insured. Smith would also receive a monthly statement detailing the amount he owed with respect to the policy. He was allowed 45 days to remit the proper amount to New Hampshire.
On February 2, 1988, Smith, and Sid Smith & Associates, Inc., executed a promissory note in the amount of $31,031.42 in favor of New Hampshire. The note stated that "[t]he entire principal balance, less applicable credits, shall be payable at New Hampshire Insurance Company in Jackson, Mississippi, or such other place as the Note holder may designate on the 28th day of March, 1988." (emphasis added) It is not disputed that Smith did not make any payment on the note.
New Hampshire filed suit in Hinds County Circuit Court on August 9, 1988. New Hampshire alleged that Smith had defaulted on the note, and owed the aforementioned principal amount plus a reasonable attorney fee, as provided for in the note. New Hampshire alleged that one-third of the amount of the note, or $10,343.80, *342 would be a reasonable fee, making the final amount demanded $41,375.22. Smith answered and denied that he owed any sum to New Hampshire, alleging that "applicable credits" owed to him by New Hampshire wiped out any debt he might have owed.
New Hampshire moved for summary judgment on November 16, 1988. Smith subsequently responded, denying that New Hampshire was entitled to summary judgment. Smith asserted a counterclaim in his response to summary judgment, alleging that he was entitled to credits from New Hampshire of $42,081.69. The net effect of the counterclaim was that New Hampshire owed Smith $11,050.27. The motion for summary judgment was denied.
The trial in this cause was held on January 16, 1990. Madeline Souter, accounting supervisor with the New Hampshire Insurance Group, testified that Sidney Smith had not paid anything on the note in question. Souter testified that other debits had been added to the amount of the note since it had been executed, and Smith's total debt had reached $42,187.45.
Souter stated that Smith was sent monthly statements for the money he owed to New Hampshire. When these amounts were not paid, the next step was suspension of the agent. Souter stated that Smith, or the agency agreement, was suspended after Smith had paid his September 1987 balance with a bad check. The check was returned to Smith or his agency on December 22, 1987. Souter was informed by her home office that if the check was good she could re-deposit it. One of Smith's employees told Souter that the check was good, and Souter re-deposited it. On January 6, 1988, it was again returned for nonsufficient funds.
Souter was instructed to notify Smith by certified letter that he was suspended as an agent. Souter stated that Smith informed her that he was having some financial trouble as far as collecting from his insureds, and this was the reason he could not pay. Souter said that Smith never told her that he didn't owe the money. Souter stated that the $31,000.00 promissory note was Smith's last chance to pay up and avoid litigation. She felt that the "less applicable credits" language was self-explanatory, and maintained that Smith's present indebtedness was $42,187.45.
Sid Smith was called as an adverse witness. He testified that he did not renew his insurance license in 1987, and that he was currently working as a real estate broker. Although Sidney Smith & Associates still existed as a corporation, he did not seem familiar with its legal status. He served as president of the corporation and his wife was the secretary. At the time of trial, the corporation did not employ anyone and was in the real estate business instead of the insurance business.
Smith stated that he started having trouble paying New Hampshire in 1987. He seemed to place some of the blame on the people who were working for him, as he stated that "I didn't do a lot of insurance work." Smith stated that New Hampshire started placing surcharges on policies involving property outside the city limits around 1986, and insureds would refuse the policy once they became aware of the premium amount.
Smith first became aware of problems with credits in 1987. He claimed to have found policies from 1986 that a former employee, Eddie Brewer, had returned to New Hampshire for credit, but the credit had never been received. New Hampshire sent Les Carter to straighten things out. Smith said that Carter agreed that there were some applicable credits, and that he would get back with Smith on this matter.
Although Smith did not know when he had last filed a federal tax return on his business and he had not sold any insurance since January or February of 1988, he claimed that New Hampshire owed him money according to his books. Smith also denied that New Hampshire had cancelled his agency, saying that he was the one who had cancelled the agency agreement. New Hampshire rested after Smith's testimony.
Sid Smith was recalled on direct examination. He testified that his troubles with New Hampshire began when the company was taken over by Audubon Insurance. Smith emphasized again that Les Carter *343 assured him that he would receive the credits that he deserved.
In January 1988, Smith started making arrangements to sell the insurance agency. Smith claimed that the buyer of the agency was going to take the policies in and get the credits for him. For some reason this did not work out, and Smith received two letters, dated March 21, 1988, from New Hampshire's personal lines manager, Connie Hudson. One letter was attached to six separate forms labeled "cancellation request/policy release," with each form representing a different insured. The letter pertained to "unacceptable back-dated cancellations" and stated:
As much as we would like to be able to work out the attached items for you, the Company has had liability for the full and expired policy terms; and premium is earned for the coverage.
The second letter was attached to nine of the same kinds of forms, each containing the name of a different insured. This letter pertained to "unacceptable flat cancellations, but acceptable pro-rated cancellations due to non-payment of premium." The letter stated:
Here are copies of the nine (9) cancellation requests that we're having to treat as 4-3-88 pro-rata's for non-payment of premium. That particular date is set by our intent to mail the required Notices of Cancellation tomorrow and included in them the applicable time allowance that the policy conditions mandate.
The back-dated flat's would not have been workable even if the Acord forms had been fully and properly completed, especially mortgagee-wise. Liability has existed under these policies and the Company is due premium for such exposure. So, Sid, as the only equitable way we've got to support your effort to cancel unpaid policies, the 4-3-88 pro-rata activity is under way.
Smith denied that he had ever received an itemized list of charges and credits so that he would know his status. He contradicted Souter's testimony that he had received accountings through 1989. Smith claimed that he signed the promissory note in question because New Hampshire said it would straighten out the problem with the credits if he did. Smith stated that the "less applicable credits" language had been added to the promissory note at his insistence. Smith had also promised to sell the agency if the credit problems could be worked out.
Smith claimed that several policies were written and then cancelled by New Hampshire, and Smith was charged with the policy but never received credit. He maintained that much of his trouble resulted from Audubon Insurance Company's takeover of New Hampshire, and Audubon's attempt to force smaller agents like himself out of business. Smith testified to a list of sums he had claimed were owed to him by New Hampshire, however, he had little documentation as to any debt New Hampshire may have owed; nevertheless, he claimed that the total amount owed to him was $11,048.27. Smith denied that the policies were cancelled because he had failed to remit to New Hampshire the required amounts. He continued to place some of the blame on his former employees. Smith claimed that in April 1989 New Hampshire had tried to sign him on again as an agent. Sid Smith rested at this point.
Souter was called as a rebuttal witness. She admitted that there were credits due Smith which were not listed on Exhibit 3, totalling $2,800.00. She theorized that these claims involved cancellations that New Hampshire was not informed of. Working from Exhibit 3, Souter compared New Hampshire's claim of gross premiums paid, $64,261.00, with the amount that was due from Sid Smith, $42,187.00. She stated that "[t]he difference between the two is the commission he should have earned ... [a]pproximately $22,000.00." As far as the computer printout, where there was a credit and a debit of the same amount, Ms. Souter testified that Smith had in fact paid nothing and that these entries were for bookkeeping purposes only.
New Hampshire did not request a directed verdict at the end of all the evidence, or a peremptory instruction. The jury found in favor of Sid Smith on the matter of New *344 Hampshire's claim against him. It further found in favor of Smith on his counterclaim against New Hampshire, awarding damages of $11,000.00. New Hampshire subsequently moved for judgment notwithstanding the verdict (j.n.o.v.), or in the alternative a new trial. The motion was denied.

II.
New Hampshire argues first on appeal that the trial court erred in not granting its post-trial motion for j.n.o.v. Rule 50(b) of the Mississippi Rules of Civil Procedure states:
Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than ten days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict... .
(emphasis added). Rule 50(b) makes it clear that a motion for directed verdict is a procedural prerequisite for a motion for j.n.o.v.
This Court, in Maxwell v. Illinois Central Gulf R.R., 513 So.2d 901 (Miss. 1987), followed the federal lead in liberally construing what could qualify as a motion for directed verdict. This Court found that a peremptory instruction was the functional equivalent of a motion for directed verdict and could satisfy the prerequisite requirements of Rule 50(b). It appears that nothing has heretofore been done to weaken the requirement that some kind of directed verdict motion, or its equivalent, be made before a j.n.o.v. motion could be considered.
In the case at bar New Hampshire made no motion at any time that could be considered as a motion for directed verdict as to the counterclaim asserted against it. According to Rule 50(b) and the case law of this State, the lower court would be precluded from granting New Hampshire's motion for j.n.o.v. Such a holding, however, is nonsensical and is made only because we have held it before. In many situations for reasons of judicial economy, a judge will reserve his ruling on a motion for a directed verdict made at the close of all the evidence until the jury returns its verdict. As long as a party makes its motion for j.n.o.v. within the allotted time after the jury verdict, the lower court should not be precluded from granting such motion if the evidence is insufficient to support such verdict simply because the party failed to make a motion for a directed verdict prior to the jury's deliberation. Any cases holding otherwise are hereby overruled and Rule 50(b) is hereby amended to comply with this holding.
In support of its contention that the lower court erred in denying its motion for j.n.o.v. or in the alternative, a new trial, New Hampshire relies on Garrett v. Pigford, 218 Miss. 840, 67 So.2d 885 (1953), and Tate v. Rouse, 247 Miss. 545, 156 So.2d 217 (1963). Both cases stand for the proposition that payment is an affirmative defense, and when an indebtedness has been established, the burden of proving payment is on the party that asserts it. In Garrett, the appellant provided little in the way of proof of payment beyond his assertion that he had indeed paid the money in question. This Court stated that
[T]he bare statement of appellant that he has paid what he owed on the notes, with no evidence whatsoever as to the time, place, method and manner of payment, is insufficient to create an issue for the jury on the question of payment where the original note in question is still in possession of its owner, and especially where, as in this case, the maker renewed the notes from time to time and does not claim to have paid more than $10, on the last renewal.
Garrett, 218 Miss. at 845-46, 67 So.2d at 887. The same is true in the case sub judice where the appellee Smith, although testifying that he had complete records, relied solely on his testimony without ledgers, documents or other proof to claim payment by set off. New Hampshire further *345 relies on Dennis v. Prisock, 254 Miss. 574, 582-83, 181 So.2d 125, 128 (1965), which states that proof of damages must be reasonably certain. See also Hudson v. Farrish Gravel Co., 279 So.2d 630, 635 (Miss. 1973) (damages which are uncertain, contingent or speculative are not recoverable); Wall v. Swilley, 562 So.2d 1252, 1256 (Miss. 1990) (damages may be recovered only to extent that evidence removes the amount from the realm of speculation and renders it reasonably certain); Kaiser Investments, Inc. v. Linn Agriprises, Inc. 538 So.2d 409, 415 (Miss. 1989) (same); Travelers Indemnity Co. v. Davis Wholesale Drug Co., 234 So.2d 604, 605 (Miss. 1970) (exactitude in jury verdict not always required; discretion as to damage award is wide but not arbitrary, and must be exercised reasonably and in accord with instructions and testimony).
The one certainty in the case at bar is that Sid Smith executed a promissory note in the amount of $31,031.42. Besides this, little appears clear. Smith relies partially on Exhibits 3 and 6 in an attempt to verify or substantiate his damages award.[1] The problems with Smith's alleged "applicable credits" are many. Smith cites credits for which there is no insured; he cites insureds and amounts which do not appear on Exhibits 3 or 6, but only in testimony; certain credits appear to be listed twice (Larry Larkins, $219.00; Bessie Wilson, $400.00); one amount is listed on Exhibit 3, and another amount on Exhibit 6, for the same insured (Mark Ginn, Claude Willis); credits taken from Exhibit 6 come from two categories, "whole premium" and "return premium" (Mark Ginn, Larry Larkins); Exhibit 3 has a number of different classifications from which allegedly applicable credits are taken, including "flat canc," "renewal prem," "can cr," "10/30 chargeback," "prem due comp," "p/r canc," "canc cr taken twice," "revised canc," "revised flat canc," "agents prem," and "pir canc cr taken twice", (many of these technical terms or abbreviations of technical terms are not explained as to meaning or significance); figures cited on Exhibit 3 as applicable credits are listed under the category "gross premium," except for one entry, in which the figure cited is the "current net" (Rest Dyck); several of the figures listed in Exhibit 6 are illegible. Even if Smith can be given credit for everything he claims in his brief, then that figure would be $39,325.44. Compared with Smith's admitted debt of $31,031.42, this would leave maximum damages, or credits, of $8,294.02, as opposed to the $11,000.00 he was awarded by the jury. In addition, the jury attempted to award attorney's fees, which were not recoverable in Smith's case. Though the trial court correctly struck this portion of the verdict as surplusage, it tends to show the jury was somewhat confused.
This Court's general rule is that "a damage award may be altered or amended only when it is so excessive that it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience." Royal Oil Co., Inc. v. Wells, 500 So.2d 439, 449 (Miss. 1986). A more appropriate standard, however, appears in Wright v. Stevens, 445 So.2d 791 (Miss. 1984). Wright, a contractor, agreed to build a swimming pool for Stevens. Wright partially completed the pool and then disappeared. Stevens had the pool completed and sued Wright for $13,000.00 in actual damages. The jury awarded $15,000.00. The trial court reduced the award to $13,000.00. Finding that Stevens had only proven $9,175.25 in damages, this Court reversed the damages award which exceeded this amount. This action takes the form of reversing and rendering judgment for the excess amount.
In Wright, a certain amount of damages were quantifiable. Despite the latitude a jury is accorded in making a damage award, the award in this case lacks the requisite certainty or foundation to take it out of the realm of speculation. This Court, however, does not have to enter judgment notwithstanding the verdict in lieu of a new trial.
Rule 50(b) contains no language which absolutely requires a trial court to enter *346 judgment notwithstanding the verdict even though that court is persuaded that it erred in failing to direct a verdict for the losing party. The rule provides that the trial court "may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed." This "eitheror" language means what it seems to mean, namely, that there are circumstances which might lead the trial court to believe that a new trial rather than a final termination of the trial stage of the controversy would better serve the ends of justice. In short, the rule does not compel a trial judge to enter a judgment notwithstanding the verdict instead of ordering a new trial; it permits him to exercise a discretion to choose between the two alternatives.
Cone v. West Virginia Pulp and Paper Co., 330 U.S. 212, 215, 67 S.Ct. 752, 754-55, 91 L.Ed. 849, 852 (1947) (emphasis added).
The Advisory Committee on rules for Civil Procedure in commenting on Rule 50(b) stated that "A trial court or an appellate court in setting aside a verdict always has discretion, if justice requires it, to order a new trial, instead of directing the entry of judgment. Rule 50(b) states that the court on a motion for judgment notwithstanding the verdict `may either order a new trial or direct the entry of judgment' for the moving party." Report of Proposed Amendments to Rules of Civil Procedure (1946) 66.
Cone, 330 U.S. at 216 n. 1, 67 S.Ct. at 755 n. 1, 91 L.Ed. at 852 n. 1 (emphasis added).
Finding reversible error committed below, the judgment of the circuit court should be reversed and remanded for a new trial.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER and SULLIVAN, JJ., concur.
McRAE, J., dissents with separate written opinion joined by DAN M. LEE, P.J.
BANKS, J., not participating.
ROBERTS, J., not participating according to supreme court internal rules.
McRAE, Justice, dissenting:
I respectfully dissent. We have before us the record of a trial where both sides presented evidence, where that evidence was presented to a jury, and where the jury weighed the evidence and reached a verdict. Claiming that the verdict was against the overwhelming weight of the evidence, appellant New Hampshire Insurance Company filed a motion for judgment notwithstanding the verdict. The trial judge, noting that New Hampshire had failed to file either a motion for a peremptory instruction or a motion for directed verdict, found that the defendant had waived its right to seek a J.N.O.V. Despite the majority's attempt to manufacture error on appeal, none appears of record. The verdict represents the legitimate outcome of a jury's deliberations over hotly contested material issues; the trial court's rejection of New Hampshire's J.N.O.V. motion is firmly grounded in the Rules of Civil Procedure and in our caselaw. Given the total absence of reversible error, I would affirm.
First, the law is clear that a party may move for judgment notwithstanding the verdict only if the record reflects a prior motion for peremptory instruction or directed verdict. MRCP Rule 50(b) provides in part: "Not later than ten days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict." The mandate is clear and unambiguous: A motion for directed verdict is an essential prerequisite to a motion for judgment notwithstanding the verdict. The rules make no other provision whatsoever for entry of J.N.O.V.
Our caselaw affirms the rule's requirement. In Maxwell v. Illinois Central Gulf Railroad, 513 So.2d 901 (Miss. 1987), we held:

*347 Rule 50(b) does indeed provide that a motion for directed verdict, at the end of all the evidence but before the case is submitted to the jury, is a procedural prerequisite to a subsequent post-verdict motion for judgment notwithstanding the verdict.
The federal courts, in construing the federal counterpart to MRCP Rule 50(b), have ruled with perfect unanimity in every circuit that a motion for directed verdict or for a peremptory instruction must precede a motion for J.N.O.V. See, e.g., Della Grotta v. Rhode Island, 781 F.2d 343 (1st Cir.1986); Hilord Chemical Corp. v. Ricoh Elec., Inc., 875 F.2d 32 (2d Cir.1989); Mallick v. International Brotherhood of Elec. Workers, 644 F.2d 228 (3d Cir.1981); Aetna Casualty & Surety Co. v. Yeatts, 122 F.2d 350 (4th Cir.1941); Seidman v. American Airlines, Inc., 923 F.2d 1134 (5th Cir.1991); Exxon Corp. v. Exxene Corp., 696 F.2d 544 (7th Cir.1982); Hubbard v. White, 755 F.2d 692 (8th Cir.), cert. denied, 474 U.S. 834, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985); Murphy v. City of Long Beach, 914 F.2d 183 (9th Cir.1990); Trujillo v. Goodman, 825 F.2d 1453 (10th Cir.1987); Austin-Westshore Constr. Co. v. Federated Dep't Stores, Inc., 934 F.2d 1217 (11th Cir.1991); Nestier Corp. v. Menasha Corp.-Lewisystems Div., 739 F.2d 1576 (Fed. Cir.1984); Sector Refining, Inc. v. Enterprise Refining Co., 771 F.2d 496 (Temp.Emer.Ct.App. 1985); see also 5 Moore's Federal Practice, ¶ 50.08 at 50-83 (1992) ("[A] motion for judgment as a matter of law made after the verdict cannot be entertained unless the moving party requested judgment as a matter of law prior to the submission of the case to the jury by moving for such a judgment at the close of all the evidence."); 9 C. Wright & A. Miller, Federal Practice & Procedure, § 2537 at 596 (1971) ("A motion for judgment notwithstanding the verdict cannot be made unless a motion for directed verdict was made by the party at the close of all the evidence."). The court in Mutual Beneficial Health & Accident Ass'n v. Thomas, 123 F.2d 353, 355 (8th Cir.1941), explained the reason for this principle:
It is only where a litigant has made motion for a directed verdict that he may ask the court to enter judgment non obstante veredicto. It is only in this manner that the question may be re-examined as a question of law. To ask the court to enter a judgment, contrary to a general verdict of the jury where no motion for a directed verdict has been interposed, is simply to ask the court to reexamine the facts already tried by the jury.
The finding of facts, of course, is the sole prerogative of the jury. Had the trial judge in the instant case granted New Hampshire Insurance Company's motion for J.N.O.V., he would not only have violated MRCP Rule 50(b); he would also have encroached upon the fact-finding domain of the jury. Yet that is precisely what the majority is instructing trial courts to do in today's opinion.
In any event, the majority errs in concluding that the jury verdict in Smith's favor was unreasonable and unsupported by the evidence. Plaintiff New Hampshire Insurance Company sued on a promissory note which obligated Smith to pay $31,031.42 "less any applicable credits." New Hampshire also sought $10,343.80 in attorney's fees bringing the total to $41,375.22. Smith, alleging that New Hampshire owed him an amount greater than the sum sued for, counterclaimed for $11,000.00. The jury awarded Smith $11,000.00.
In light of the evidence, the verdict is entirely reasonable. Smith put on documented and specific evidence of credits owed to him by New Hampshire in the amount of $39,325.44. In addition, Smith testified that New Hampshire had overcharged him on certain accounts in the amount of $20,034.40. While this evidence is disputed by New Hampshire, it is axiomatic that "conflicts in the testimony and the veracity of witnesses are for the determination of the jury, not the judge." ICRR v. Harrison, 224 Miss. 331, 80 So.2d 23, 26 (1955); accord BFGoodrich, Inc. v. Taylor, 509 So.2d 895 (Miss. 1987); Adams v. Green 474 So.2d 577 (Miss. 1985); Gates Rubber Co. v. Duke, 367 So.2d 910 (Miss. 1979); Mississippi State Highway Commission *348 v. Robertson, 350 So.2d 1348 (Miss. 1977). Moreover, when considering the merit of a motion for judgment notwithstanding the verdict,
the trial court must consider all the evidence in the light most favorable to the non-movant, who must also be given the benefit of all favorable inferences that may be reasonably drawn from the evidence; if the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, granting the verdict is required; on the other hand, if there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand.
Chisolm v. Eakes, 573 So.2d 764, 768 (Miss. 1990) (quoting Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1985)). Applying this standard to the evidence contained in the record now before us, one can scarcely fault the trial court for denying New Hampshire's motion for J.N.O.V. In City of Jackson v. Locklar, 431 So.2d 475, 478-79 (Miss. 1983), we emphasized the limited power of this Court in reviewing denials of motions for J.N.O.V. and held:
Our institutional role mandates substantial deference to the jury's findings of fact and to the trial judge determination whether a jury issue was tendered. When a verdict is challenged via appeal from denial of a motion for j.n.o.v., we have before us the same record the trial judge had. We see the testimony the trial judge heard. We do not, however, observe the manner and demeanor of the witnesses. We do not smell the smoke of the battle. [Cite omitted]. The trial judge's determination whether, under the standards articulated above, a jury issue has been presented, must per force be given great respect here.
In reversing the trial court's denial of New Hampshire's motion for J.N.O.V., the majority is second guessing both the jury and the trial judge and is assuming the role of a "supreme thirteenth juror." Such is clearly beyond the function of this Court. After reading the cold, black and white record, I cannot say that I personally would have returned a verdict for Smith. However, I did not see the demeanor of the witnesses nor did I "smell the smoke of the battle." Such decisions are the province of the jury. Our role is to see that a fair trial  not a perfect trial  is rendered. We are certainly not the supreme thirteenth juror. The majority seems to be troubled by the fact that Smith used New Hampshire's documents as evidence and produced little documentation of his own. Smith testified, however, that New Hampshire's agent carried away his record sheets. Given the circumstances, what better way could Smith have hammered New Hampshire's allegations than by using New Hampshire's own documents to prove his case?
In closing, I reemphasize that New Hampshire waived its right to seek judgment notwithstanding the verdict by failing to move for a directed verdict or peremptory instruction. Even if New Hampshire had satisfied the procedural prerequisites for J.N.O.V., however, the trial court would still not have manifestly erred in denying the motion. New Hampshire appears to have failed to refute some of Smith's statements, and the jury filtered through the evidence and found for Smith. I would affirm.
DAN M. LEE, P.J., joins this opinion.
NOTES
[1] Exhibit 3 is an accounting printout introduced into evidence by New Hampshire. Exhibit 6 is a policyholder list introduced into evidence by Smith.