Shawn ANDERSON, Individually, and Joanne Anderson, Appellants,

v.

GLYNN CONSTRUCTION CO., INC., Appellee,

and

Saliger, Inc., Defendant.

No. 86–1083.

Supreme Court of Iowa.

March 16, 1988.

James L. Kramer and Thomas J. Bice of Johnson, Erb, Latham, Gibb & Carlson, P.C., Fort Dodge, for appellants.

John E. Orrell, Jr., of Hopkins & Huebner, P.C., Des Moines, for appellee.

Considered by LARSON, P.J., and SCHULTZ, CARTER, LAVORATO, and NEUMAN, JJ.

CARTER, Justice.

Plaintiff, Shawn Anderson, a grain elevator employee, appeals from a directed verdict in a personal injury action against defendant, Glynn Construction Company. Defendant is an independent contractor who repaired and rebuilt a grain auger used by plaintiff's employer. Plaintiff argues that the district court's judgment

should be reversed because he presented submissible jury issues under two theories of recovery, *i.e.*, strict liability in tort and negligence. Breach of warranty claims asserted by plaintiff at trial have been abandoned on appeal. While we disagree that plaintiff's evidence presented a jury question based on strict liability in tort, we do find that the district court erred in directing a verdict on plaintiff's negligence claims.[1]

Plaintiff sustained serious injuries on October 23, 1984, when he slipped and fell into a grain auger at the Bruntlett Elevator where he was employed. These injuries required amputation of a portion of plaintiff's left leg. The injury occurred in a building called the "annex" which was twenty feet wide and eighty feet long. The annex contained overhead grain storage bins which discharged into an auger system in the floor. This auger, which ran the length of the building, conveyed grain to other portions of the elevator complex. The grain enters the auger system through open hopper boxes. Except at the hopper box locations, the auger is entirely enclosed.

The annex was constructed in 1946. The original floor auger and hopper boxes were also installed at this time. There have never been any grates or other shielding devices at the point where the auger runs beneath the hopper boxes. From 1968 to 1983, Glynn Construction Co. was the exclusive repairer and parts supplier of grain-handling equipment for the Bruntlett Elevator. The floor auger in the annex consists of several connected sections, and, during this fifteen-year period, defendant replaced all sections of the auger.

Defendant's work on the annex auger was not all performed at the same time. It occurred over a period of time. Whenever a particular section of the auger would wear out or become damaged, it was replaced. In addition to replacing the auger sections, defendant performed other modifications on the grain auger system in the

annex. None of this work, however, related directly to the hopper boxes. Glynn Construction Co. was at all times aware that the auger in the floor of the hopper boxes was not shielded. Plaintiff, who had been employed at the elevator since 1978, was also fully cognizant of the fact that the auger was unguarded where it passed through the hopper boxes.

The covers placed above the auger provide a path where elevator employees are sometimes required to walk in performing their work. At the points where this path is interrupted by the hopper boxes, there is room to walk around the boxes on the adjacent flooring. The hopper boxes are constructed of wood. They are rectangularly shaped and rise above the auger cover. The back of the hopper box abuts a wall of the annex. The ends rise up several feet above the auger cover. The front of the box rises above the auger cover only a few inches. The top edge of this low front side is approximately three-quarters of an inch thick. The dimension of the hopper box opening parallel to the auger is approximately thirty-six inches.

Plaintiff testified that on the evening of the accident the flooring adjacent to the auger covers was wet. Persons walking on it were subject to electrical shock. In order to avoid walking on these "hot spots," plaintiff attempted to cross over the hopper box by placing his feet on the top of its low front side. In so doing, his left leg accidently slipped into the pit and was mangled by the auger.

Defendant's job superintendent was called as a witness by plaintiff and identified written safety instructions prepared by the manufacturer of the auger components. These safety instructions, which were received in evidence, stated that:

Feed openings ... shall be constructed in such a way that the conveyor screw is covered by a rugged grating. If the nature of the material is such that a grating can't be used, then the exposed

1. Plaintiff's wife, Joanne Anderson, is also a plaintiff in the action seeking damages for loss of her husband's support, companionship and society. She has also appealed from the district court's judgment. Because her right of recovery is dependent upon the same legal theories applicable to her husband's claims, we will discuss the issues as if only one plaintiff is involved.

section of the conveyor is to be guarded by a railing and there shall be warning signs posted.

The evidence would permit a finding that defendant did not advise any of the officials at Bruntlett Elevator or their employees concerning the desirability of placing gratings, railings, and warning signs in or around the hopper boxes. Other significant facts which bear upon our disposition of this appeal are stated and considered in our discussion of the legal issues which are presented.

## I. The Strict Liability Claim (Restatement (Second) of Torts § 403).

■ Plaintiff asserts that the district court erred in directing a verdict against him on his claim founded on strict liability. Plaintiff's strict liability argument is not premised on Restatement (Second) of Torts section 402A (1965) dealing with special liability of the seller of a product. Rather, plaintiff posits his argument on section 403 of the Restatement which subjects an independent contractor who "makes, rebuilds, or repairs a chattel for another ... knowing or having reason to know that his work has made it dangerous for the use for which it is turned over" to a liability akin to strict liability in tort.

Defendant urges that no liability has been established under section 403 of the Restatement. It points out that comment b accompanying this section states that:

The rule stated in this Section applies only where the contractor knows or has reason to know that *the work which he has done* in making, rebuilding, or repairing the chattel has made it unsafe for use.

*Id.* (emphasis added). Emphasizing the italicized words, defendant argues that the open hopper boxes were in place prior to the time that it replaced any of the sections of the auger assembly. Defendant attributes that circumstance to a design decision by the owner of the facility for which it bears no responsibility. In support of this argument, it cites *Johnson v. William C. Ellis & Sons Ironworks*, 604 F.2d 950, 956 (5th Cir.1979), *modified on other grounds,* 609 F.2d 820 (1980), which holds that strict liability does not arise from defects which are neither created nor aggravated by a furnisher of services.

Plaintiff counters defendant's argument by reference to that portion of comment b of section 403 which provides:

It is not, however, necessary that a contractor should know that the work which he has done in rebuilding or repairing [the] chattel has made its condition worse than it was before the work was done. It is enough that the contractor knows that the rebuilding or repairs have not been sufficient to make the ... chattel as safe for use as care and competence would make it, and that it is used or permitted to be used in reliance upon his care and competence. The fact that an inadequately rebuilt or repaired automobile or other chattel is turned over by the contractor to the employer as rebuilt or repaired gives it a deceptive appearance of safety, even though its condition is in fact improved by the work which the contractor has done upon it.

*Id.*

In considering the parties' conflicting claims as to the application of section 403, we think the rationale of comment *b* is found in its final sentence. The language of that sentence is a recognition that rebuilding or repair of some but less than all of the defects in a particular chattel may give a deceptive appearance of safety. Viewing the evidence most favorably toward plaintiff, we fail to see how defendant's work on the augers created that type of deceptive appearance. No act of defendant in replacing the sections of the auger beneath the open hopper boxes misled plaintiff or his employer on the question of whether the auger remained unguarded in these locations. They were aware of that fact both prior to and after any work by defendant at the Bruntlett Elevator. The facts do not support a submissible jury issue under section 403.

## II. The Negligence Claims.

Plaintiff next urges that the district court erred in directing a verdict on his negligence claims. This contention is posit-

ed on two separate and distinct theories of negligence, *i.e.*, those envisioned by Restatement (Second) of Torts section 404 (1965) and those envisioned by section 388 of that Restatement. While we disagree that a jury question was presented under section 404, we conclude that the district court did err in not submitting a claim to the jury predicated on section 388.

A. *Restatement (Second) of Torts Section 404.* Section 404 of the Restatement involves claims against an independent contractor who negligently rebuilds or repairs a chattel. Where, as here, the contractor has not acted to increase the chattel's dangerous propensities, comment *b* of section 404 invokes the same rationale of "deceptive appearance of safety" that has been recognized in the application of section 403. Consequently, our reasons for concluding that no right of recovery exists under section 403 prompt us to reach a similar result as to claims founded on section 404.

B. *Restatement (Second) of Torts Section 388.* Plaintiff's reliance on section 388 of the Restatement presents an entirely different theory of negligence. That section provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Id.* We have generally recognized and approved the standard of care recognized in this section of the Restatement. *See Nichols v. Westfield Indus.*, 380 N.W.2d 392,

400 (Iowa 1985); *Rinkleff v. Knox*, 375 N.W.2d 262, 267 (Iowa 1985); *Henkel v. R & S Bottling Co.*, 323 N.W.2d 185, 188 (Iowa 1982); *West v. Broderick & Bascom Rope Co.*, 197 N.W.2d 202, 209 (Iowa 1972).

Defendant urges that the facts of this case provide no right of recovery under section 388 in light of our decision in *Nichols*, 380 N.W.2d at 401. In that case, we stated:

> We conclude that, under section 388 of the Restatement, a supplier's duty is to warn of dangers which are not obvious with respect to use of the chattel in the condition in which it is supplied. It does not require the supplier to give information concerning available means for amelioration of obvious dangers, even though it is aware of these means and the party to whom the chattel is supplied is not.

*Id.* (citation omitted). The *Nichols* case involved a casual sale by a farmer of a piece of used machinery which contained an unguarded auger. The facts of that case disclosed no special knowledge by the seller of the operational details of the buyer's intended use. As a result, we believe the language quoted above was intended to describe the duty of a supplier of a chattel who possesses no special knowledge that it would be used in a dangerous manner. In sharp contrast to the *Nichols* situation, defendant in the present case had observed over a fifteen-year period that plaintiff's employer was not acting to guard against the potential for injury to its employees from the unguarded hopper boxes.

For purposes of a section 388 analysis, we believe defendant's installation of auger sections beneath the hopper boxes during the period from 1968 to 1983 involved supplying a chattel with dangerous propensities. We recently recognized in *C & F Maintenance & Property Management v. Eliason & Knuth Drywall Co.*, 418 N.W.2d 44, 46 (Iowa 1988), that an independent contractor is ordinarily not responsible for failing to correct dangerous conditions which are not within the area of performance for which it contracted. This circumstance does not, however, excuse the supplier of a dangerous chattel from giving

an adequate warning of its dangerous propensities to the extent required by section 388 of the Restatement.

We have recognized that superior knowledge is an important element in the application of section 388. *See Rinkleff*, 375 N.W. 2d at 268; *West*, 197 N.W.2d at 209. However, that inquiry is not limited, as defendant suggests, to a consideration of the parties' relative knowledge of whether an auger operating at full power can cause serious injury to a human limb. The inquiry is broader in scope and extends to knowledge of the likelihood that users of the auger might accidentally slip into the open hopper box in spite of knowing the auger's propensities to maim them.

We cannot conclude as a matter of law that defendant did not have superior knowledge on the latter question. Unlike plaintiff and plaintiff's employer, defendant had the benefit of the manufacturer's warnings concerning the dangers of unguarded openings for feeding grain into the auger system. The district court erred in not submitting plaintiff's negligence claim to the jury based on the standard recognized in section 388 of the Restatement.

### III. *Defendant's Evidentiary Issues.*

■ Defendant filed a notice of cross appeal for purposes of challenging the admissibility of the manufacturer's literature pertaining to shielding the auger. It urges that defendant's possession of these materials had not been shown to antedate its work at the Bruntlett Elevator.

We conclude that the challenged evidence was admissible. Our discussion of the issues on plaintiff's appeal highlights the relevance of these materials on the issue of superior knowledge. We believe any deficiency in foundation concerning the time this information was supplied to defendant was obviated by the testimony of defendant's job superintendent concerning knowledge of the general requirements contained in the literature at times material to the litigation.

### IV. *Other Evidentiary Issues.*

Plaintiff urges that in the event of retrial we should correct the district court's evidentiary rulings prohibiting his expert witness from testifying concerning OSHA standards and industry approved safety codes. Because these issues may arise on retrial, we have reviewed these rulings.

We find that the district court's views that the OSHA standards were inapplicable correctly reflect the position we adopted in *Rinkleff*, 375 N.W.2d at 266–67. With respect to the admissibility of the American National Standards for Conveyors and Related Equipment (plaintiff's exhibit 17), our interpretation of the district court's evidentiary ruling differs from that advanced by plaintiff. We interpret that ruling as finding the exhibit to be admissible upon adequate identification and explanation. Our review of the record suggests that such ruling was proper. *See Jorgensen v. Horton*, 206 N.W.2d 100, 103 (Iowa 1973); Iowa R.Evid. 901(a).

We have considered all issues presented and conclude that the judgment must be reversed and the case remanded for retrial of the negligence claims of plaintiffs Shawn Anderson and Joanne Anderson. Costs of appeal are taxed to appellee.

REVERSED AND REMANDED.