585 So.2d 700 (1991)
Larry J. KUSSMAN
v.
V & G WELDING SUPPLY, INC. a Mississippi Corporation.
No. 07-CA-59267.
Supreme Court of Mississippi.
August 14, 1991.
Edward J. Bogen, Jr., McGee & Bogen, Leland, for appellant.
Andrew N. Alexander III, Carl J. Marshall, Lake Tindall Hunger & Thackston, Greenville, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and McRAE, JJ.
McRAE, Justice, for the Court:
This is an appeal from the Circuit Court of Washington County, Mississippi, involving a personal injury suit brought by appellant Larry J. Kussman against V & G Welding Supply, Inc., a Mississippi Corporation, for negligently repairing tools. The plaintiff, Larry Kussman, suffered extensive injuries when he fell from a roof after he was severely shocked by a power tool. He sued V & G Welding for negligently repairing the tool shortly before the accident.[1] At the end of all the evidence the trial court granted V & G's motion for a directed verdict. The plaintiff appeals and assigns as error the actions of the trial judge in granting the directed verdict in that the court: (1) failed to give the plaintiff's expert testimony the proper consideration and (2) failed to apply the doctrine of res ipsa loquitur. We reverse and remand for a new trial.
*701 Kussman worked for Ventura, Inc. in Greenville, Mississippi erecting and installing metal buildings. Prior to the accident, V & G Welding had recently repaired the electrical wrench Kussman was using at the time of the accident. The employees often used electric wrenches while erecting the buildings. Sometime in June of 1980, one of the wrenches had stopped working. On June 30, someone from Ventura took the wrench to V & G to be repaired. The stated cause of the problem was that the trigger (on-off) switch was not working properly.
Philip Jones, the employee of V & G who actually made the repairs, installed a new switch, reconnected all of the power and ground wires, and replaced the switch cover. Then he tested the tool on a Sunshine Electrical Tool Tester, a machine tool which checks for any short circuits. None were indicated by the tool tested. Someone from Ventura picked up the tool on July 8.
For some reason someone returned the wrench to V & G on July 17. No one knows what happened between the time it was returned to the V & G shop for these repairs and the first time it was in V & G's shop a week earlier. Nobody knows why it was returned or the exact nature of the repairs. All that is known is that a V & G invoice shows "warranty work"[2] on the wrench and someone from Ventura picked it up on July 17.
On the morning of July 21, the plaintiff took the drill out of the tool box. At that time the wrench still had the cord wrapping and maintenance card attached to it, suggesting that it had not been used since the "warranty work." Furthermore, the foreman remembers telling Kussman to get the wrench that he had just picked up from V & G. There is some dispute as to whether the plaintiff tested the wrench before taking it up to the roof.[3] Plaintiff took the wrench to the roof of the building to perform his work. When he turned the wrench on he received a severe electrical shock that caused him to fall from the roof and suffer extensive injuries. Another employee used the wrench the next day and it "shot out sparks." The foreman immediately took the wrench and put it away so it would not be used again.
Experts for both sides inspected the wrench in anticipation of this litigation. An expert for the plaintiff inspected and partially disassembled it. That expert is now deceased and did not testify at trial. The defendant's expert came to Greenville and inspected it. Later, it was sent to an expert for the plaintiff in St. Louis, Dr. Dreifke. Both of these experts testified at trial. By the time the plaintiff's expert received the wrench it was in some twenty to fifty pieces. It is not known who disassembled the wrench, although after the defendant's expert inspected it, it was in the custody of the plaintiff or his representatives.
At trial Dreifke testified that for the plaintiff to receive a shock, there had to have been a defect in the wrench. Specifically, he noted that there was a short in the winding of the motor. He testified, quite candidly, that there was no way for him to know exactly when this defect occurred in the tool. He testified that V & G probably failed to properly repair or test it because the first time it was used it caused a severe shock. He noted that it was unlikely the defect was caused during the transportation from the shop to the work site.
As might be expected, the expert for the defendant, Dr. Forbes, offered different conclusions about the accident. He did note the same defect as the plaintiff's expert. He then opined that a short of this type would have shown up during testing at V & G and it would have shocked the repairman if he had even just turned the tool on. He also stated that the repairs *702 that were described by the repairman were properly and professionally done. On cross examination, though, he admitted that his comments and opinions were based on the repair work performed on July 8 and fully described by the repairman, and not on any repairs or testing done on July 17. He explained that neither he nor anyone else knows what V & G did on July 17. Finally, he concluded that the two possible reasons for the defect were either normal wear and tear or the fall from the building.
The defendant moved for a directed verdict at the close of the plaintiff's case, which the court denied, and again at the close of all the evidence. At this point the court granted the motion and said:
We have a blank as to what happened between the time the tool was returned initially and the time the tool was returned to the repairman [the second time]. We don't know the cause for the return nor do we know what if anything, was accomplished. And more importantly, we don't know the condition of the tool at the time it was returned to the repairman, what, if anything, he was asked to do, whether he did or did not do anything. We don't know any of these things. We have additionally a statement made by the plaintiff that at the time and place immediately prior to the accident he tested the tool by turning it on after it was connected to the electricity, and nothing unforeseen happened. Shortly thereafter without any knowledgeable information about it from anyone, the tool malfunctions and Mr. Kussman is seriously damaged... .

Analysis
Miss.R.Civ.P. 50 requires the trial court to take a case from the jury and grant a directed verdict if any verdict other than the one directed would be erroneous as a matter of law. The comment to the Rule instructs the trial court to look "solely to the testimony on behalf of the opposing party; if such testimony, along with all reasonable inferences which can be drawn therefrom, could support a verdict for that party, the case should not be taken from the jury." Hall v. Mississippi Chem. Exp., Inc. 528 So.2d 796, 798 (Miss. 1988); White v. Thomason, 310 So.2d 914 (Miss. 1975).
The plaintiff argues that the trial judge erred in granting the motion because he did not give proper weight to the plaintiff's expert testimony. The essence of the defendant's argument in support of the directed verdict is that the plaintiff wholly failed to show a defect in the product or that any act on the part of V & G constituted negligence. This assertion is supported factually, they claim, by the absence of any proof of what the repairman actually did the second time Ventura's employees brought the wrench in for repair. The repairman does not remember what or if he did anything to the tool on July 17, and the invoice merely describes "warranty work."
The plaintiff's expert testified that if the repairman had made these unknown repairs correctly, the accident would not have happened. Stated differently, he did not point to any specific act of negligence by V & G or its repairman. Rather, he pointed to a specific defect, also found by the defendant's expert, and was of the opinion that it existed on the day that the tool was brought to V & G, and concludes that if the repairman had adequately tested the tool and/or repaired it, he would have found the short.[4] More specifically, the plaintiff's expert, Dreifke, testified about the defect as follows:
It'd be my opinion that it is more likely to have been caused electrically from heat than mechanically, [from the fall] but there is no way that I can absolutely state with any absolute certainty that mechanical impact didn't cause a slight motion or something... . It's more likely to have been an electrical failure ... but ... it would be difficult for me to *703 give you odds like six-to-two or whatever. I don't know.
* * * * * *
My opinion is that there was an electrical defect in the impact wrench at the time of the accident.
Q. Do you have an opinion as to whether that defect caused the shock that Larry Kussman testified about?
A. Yes. To get a shock there had to be a defect, so the shock is caused by the defect.
* * * * * *
Q. Dr. Dreifke, based on your training, experience, and expertise in the field in which you are testifying, do you have an opinion as to whether or not the repair work on this wrench and the testing as testified to by Philip Jones was properly done?
* * * * * *
A. My opinion is that it  overwhelming probability is that the repair work and testing was not done properly.
* * * * * *
The wrench was sent to a shop because it wouldn't operate and returned a short time later and on the first use a shock occurred to the user. And the defect was either there in the wrench when the part was in the shop or it had to be abused or damaged or disassembled after it left the shop. The defect doesn't occur automatically in this type of equipment. There has to be a cause overwhelmingly for defects to appear. So if a part's properly repaired and properly tested and merely transported to a work site, if there is a defect, the defect would have been back at the work site rather than during the transportation from the repair site to the work site.
As this is a case of negligent repair, all of the elements of negligence must be proved, i.e., duty, breach, causation, and injury. Turner v. Johnson, 498 So.2d 389, 390 (Miss. 1986). Essentially, the defendant's argument is that the plaintiff failed to directly prove a breach of duty. There is no direct proof that the repairman ever worked on the area containing the defect or that he in fact failed to test the tool after the unknown repairs. However, this Court has held that negligence may be proved by circumstantial evidence where the circumstances are such as to remove the case from the realm of conjecture and place it within the field of legitimate inference. Cadillac Corp. v. Moore, 320 So.2d 361, 366 (Miss. 1975). This point can be illustrated by a brief look at the familiar "banana peel" cases. Suppose a plaintiff can only show that he slipped on a banana peel on the floor of a bus station, and nothing more. While the peel could certainly be considered a defective condition, there are many other explanations for its presence not involving negligence on the part of the bus company, such as the possibility that someone dropped it moments before the accident. On the bare facts, most courts would hold that the plaintiff had failed to meet its burden of proof. To allow the jury to infer negligence, it would be necessary to show that the peel was reasonably discoverable under the applicable standard of conduct. This, in turn, could be inferred from the condition of the peel; if it were black and flattened the jury could properly infer that it was discoverable and therefore negligent not to discover it. Of course this doesn't totally eliminate the possibility that someone dropped a black and flattened peel moments before the accident, but it takes the case out of the "conjecture or speculation" category and moves it into the "reasonable inference" category. See generally F. James, Jr., Proof of Breach in Negligence Cases, 37 Va.L.Rev. 191-92 (1951).
We have stated in Ford Motor Co. v. Matthews, 291 So.2d 169 (Miss. 1974), in discussing defective conditions of a product leaving a seller or manufacturer:
Restatement (Second) of Torts § 402A, Comment (g), at 351 (1965) states:
The rule stated in this Section applies only where the product is, at the time it leaves the seller's hand, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.

*704 Rest. (2d) Torts § 402A, Comment (i), at 352 (1965) discusses "unreasonably dangerous" in these terms:
The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.
291 So.2d at 172.
This Court further recognizes that Restatement (Second) of Torts § 404 (1964) states: "One who as an independent contractor negligently makes, rebuilds or repairs a chattel for another is subject to the same liability as that imposed upon negligent manufacturers of chattels." Comment (b) of that section further fleshes out the scope of this duty, as follows:
In order that a contractor may be subject to liability under the rule stated in this Section it is not necessary that his negligence have changed the condition of the chattel for the worse. It is enough that the chattel because of his negligence is not in that safe condition in which a competent contractor would have put it and that it is used, or permitted to be used in reliance upon the care and competent (sic) of the contractor. (See § 403, Comment b.)
Restatement (Second) of Torts, § 404, Comment b (1964).
Further, this Court would point out that under § 403, Comment (b):
The rule stated in this Section applies only where the contractor knows or has reason to know that the work which he has done in making, rebuilding, or repairing the chattel has made it unsafe for use. It is not, however, necessary that a contractor should know that the work which he has done in rebuilding or repairing an automobile or other chattel has made its condition worse than it was before the work was done. It is enough that the contractor knows that the rebuilding or repairs have not been sufficient to make the car or chattel as safe for use as care and competence would make it, and that it is used or permitted to be used in reliance upon his care and competence. The fact that an inadequately rebuilt or repaired automobile or other chattel is turned over by the contractor to the employer as rebuilt or repaired gives it a deceptive appearance of safety, even though its condition is in fact improved by the work which the contractor has done upon it.
One court recently noted that the rationale behind the comment is that if a chattel is returned to the owner before it is adequately repaired, it has a "deceptive appearance of safety". Anderson v. Glynn Const. Co. Inc., 421 N.W.2d 141, 145 (Iowa 1988).
Dreifke's opinions have a similar tone. Given the fact that Ventura's employees normally told the repairman that the tools were not working properly and the fact that it is most likely the defect existed when V & G performed the "warranty work" on the tool, he concluded that a reasonable repairman would have found the defect. Indeed, both experts testified that the defect would have manifested itself if the repairman had just turned it on. Under these facts, we are unwilling to say the defendant did not, as a matter of law, breach a duty owed to Kussman. This is no less true merely because the evidence was circumstantial. W. Prosser, Law of Torts, § 39 (4th ed. 1984); Cadillac Corp., 320 So.2d at 366. As such, the trial judge erred when he granted a directed verdict.
The plaintiff also argues that the judge should have applied the doctrine of res ipsa loquitur. The plaintiff argued the applicability of res ipsa during the defendant's motion, but the judge never expressly ruled on it.
This Court has adopted the widely accepted elements of the doctrine. They are:
1. the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence;
2. it must be caused by an agency or instrumentality within the exclusive control of the defendant; and
3. it must not be due to any voluntary action on the part of the plaintiff;

*705 4. plaintiff must not be in a position to show the particular circumstances which caused the offending agency or instrumentality to operate to his injury.
Morgan v. Mississippi Power Co., 298 So.2d 698, 700 (Miss. 1974).
This doctrine is not applicable in this case because the first prong of the test is not met: this is not the type of accident which ordinarily does not occur in the absence of someone's negligence. In fact, the testimony shows that people who use these tools do occasionally receive shocks. Furthermore, even the plaintiff's expert testified that the cause of the defect in this case was probably heat from continued use. It is evident then that shocks occur frequently enough without anyone's fault or negligence. This, combined with the fact that this Court has noted that the doctrine should be applied cautiously, leads to the conclusion that res ipsa does not apply in this case. Read v. Southern Pine Elec. Power Ass'n, 515 So.2d 916, 919 (Miss. 1987).
In conclusion, it seems a reasonable juror could conclude that it is more probable than not that the repairman was negligent in not repairing a defect which would have manifested itself if he had performed the most minimal tests or even merely turned on the tool. As such, the lower court's order granting a directed verdict in favor of the defendant should be reversed and the case remanded for further proceedings.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, and BANKS, JJ., concur.
NOTES
[1] Alternatively, the complaint alleged negligent failure to warn. In some circumstances, a repairer can be liable under this theory. Restatement (Second) of Torts § 388 comment c (1965); Slate v. Bethlehem Steel Corp., 400 Mass. 378, 510 N.E.2d 249, 251 (1987). Kussman failed to include a strict liability count in the complaint even though the Restatement provides that option in repair cases. See Restatement (Second) of Torts §§ 403 to 404 (1965).
[2] According to the repairman, the notation "warranty work" means that V & G warrants all repairs it performs for one year. There is no evidence in the record indicating the nature of the work V & G did on the tool in the last year.
[3] In this context the plaintiff should be given the benefit of all reasonable inferences, and, therefore, we will assume that he might not have tested the wrench. The trial judge, in his oral findings on the directed verdict motion, assumed the opposite.
[4] The defendant emphasized the condition of the tool once Dreifke saw it and concluded that it would be impossible to tell exactly which wire caused the shock. Presumably under the plaintiff's theory of the case, whichever wire caused the shock, the defendant should have discovered it if the repairs and testing were done properly.