# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 98-CA-00540-SCT

*NEIL R. HARRISON AND JULIA A. HARRISON*

*v.*

*FRED L. McMILLAN*

| | |
|---|---|
| DATE OF JUDGMENT: | 1/20/1998 |
| TRIAL JUDGE: | HON. SAMAC S. RICHARDSON |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JAMES W. NOBLES, JR. |
| ATTORNEYS FOR APPELLEE: | JAMES G. McINTYRE |
| | JAMES LAWTON ROBERTSON |
| | R. MARK HODGES |
| | DAVID B. MILLER |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 10/10/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/31/2002 |

**BEFORE McRAE, P.J., AND EASLEY AND GRAVES, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

## PROCEDURAL HISTORY

¶1. On February 12, 1997, Dr. Fred L. McMillan (McMillan) filed suit against Julia A. Harrison (Julia) and Neil R. Harrison (Neil) (collectively the Harrisons) in the Circuit Court of Madison County, Mississippi, for damages arising from the purchase of a residence located at 137 Overlook Pointe Drive, in the Overlook Pointe Subdivision adjacent to the Ross Barnett Reservoir. The case proceeded to jury trial before Honorable Samac S. Richardson, Circuit Court Judge, in January 1998.

¶2. The jury awarded damages in favor of McMillan against the Harrisons. On January 20, 1998, the trial court entered a judgment in favor of McMillan in the amount of $290,066.84. The Harrisons timely moved for a new trial and/or for a remittitur. On March 6, 1998, the trial court denied the Harrisons' motion for a

new trial. On April 1, 1998, the Harrisons filed their notice of appeal to this Court.[1]

¶3. The trial court, on January 22, 1999, entered an order correcting clerical mistakes and awarding post-judgment interest and attorneys' fees. The clerical correction rectified the judgment to provide that McMillan shall recover from the Harrisons, jointly and severally, on the $290,066.84 awarded, due and payable from and after January 20, 1998, and awarded interest of 8% per annum until the judgment is paid. The trial court further ordered that the judgment against the Harrisons be increased by the sum of $32,833.67, representing the additional, reasonable and necessary attorneys' fees incurred by McMillan as a result of the Harrisons' failure and refusal to pay the judgment debt. Interest of 8% per annum was further assessed on the post-judgment attorneys' fees and legal expenses, to be calculated from the date said fees and expenses were incurred by McMillan and until that said sum was paid.

¶4. On September 8, 2000, the Harrisons filed their motion pursuant to M.R.C.P. 60(b)(6) for relief from the judgment. After their notice of appeal was filed, the Harrisons discovered that an abandoned sanitary sewer line ran directly beneath the McMillan house, as well as, four other houses built by the Harrisons at Overlook Pointe. This evidence was not discovered until December, 1999, more than 6 months after entry of the final judgment. The Harrisons proceeded under Rule 60(b)(6) to set aside the jury's verdict. This Court remanded this case to the Circuit Court of Madison County with instructions to hear the Rule 60(b)(6) motion filed by the Harrisons. The motion was called for an evidentiary hearing on March 29, 2001, and, after substantial proceedings, the matter was continued and then completed on April 4, 2001. Upon due consideration, the trial court denied the Harrisons' Rule 60(b) motion, retaining jurisdiction for purposes of considering McMillan's motion for assessment of post-judgment attorneys' fees and legal expenses.

¶5. Since this Court had ordered that the Rule 60(b)(6) motion to be heard and remanded the case to the Circuit Court of Madison County, Mississippi, for hearing, subject to review by this Court on this appeal, no notice of appeal was required to be filed. On September 20, 2001, the Harrisons moved to supplement the record on appeal to include the evidence and exhibits offered at the trial court hearing on their Rule 60(b)(6) motion. The supplemental evidence is presently before this Court on appeal contained in three supplemental transcript volumes.

¶6. On April 6, 2001, Neil filed a voluntary petition for bankruptcy under Chapter 7 of the Bankruptcy Act in the United States Bankruptcy Court for the Southern District of Mississippi, Bankruptcy No. 01-0196-JEE. In due course thereafter, Neil filed in the trial court his suggestion of bankruptcy, in which he gave notice that he had filed his bankruptcy petition. Julia, however, did not seek bankruptcy protection.

¶7. On June 13, 2001, the trial court filed its final order in the case granting McMillan's motion for assessment of post-judgment attorneys' fees and legal expenses providing that the judgment against Julia in the principal amount of $290,066.84, awarded January 20, 1998, be increased together by the additional sum of $22,770.37, in addition to the sum of $32,833.67, previously provided by the order for assessment of post-judgment attorneys fees entered on January 22, 1999, together with interest at 8% per annum plus costs on said judgment until collected.

## FACTS

¶8. The Harrisons operated an upscale home construction business in the Jackson, Mississippi, area for twenty years. Julia acknowledged that as a home builder, she was aware of the customs and skills required of a builder and understood the implied warranty given when building and selling a house. The Harrisons'

building practice was to build a home and live in it for a short while before selling to avoid the State Board of Contractors' licensing requirements.

¶9. The Harrisons purchased 4 lots in the Overlook Pointe Subdivision in Madison County adjacent to the Ross Barnett Reservoir. The lot in question was lot 19. Construction began on lot 19 in the fall of 1991. The Harrisons' building permit was issued on October 7, 1991.

¶10. The residence that the Harrisons built at 137 Overlook Pointe Drive on lot 19 was the first of the four homes built by the Harrisons. The lot slopes downward toward the Reservoir. The house was a split level design, 117 feet long from west to east with a single story front section facing the street and a two story section some 64 feet in length on the Reservoir side of the house. A retaining wall is located at the split level point.

¶11. The Harrisons began trying to market the house in the summer of 1993. The house was listed with Larry Sanders Realty and the Multiple Listing Service. On August 30, 1993, the Harrisons signed a Seller's Disclosure Statement. The statement provided that the foundation repairs performed by Eddie Bankston (Bankston) were "minor" and would only require "regular upkeep."

¶12. During 1993, McMillan, a medical doctor specializing in ophthalmology, became interested in purchasing a house on the water, and he secured the services of Juda Wabha (Wabha) of Re-Max Realtors, as his broker. McMillan looked at the house in December 1993, but he passed on the house. In April 1994, McMillan again looked at the house without making an offer. In September 1994, Wabha suggested that McMillan look again at the house. In October 1994, McMillan made an offer to the Harrisons for $350,000. McMillan and the Harrisons finally agreed on a sales price of $410,000 for the house. The house had previously been appraised by Hugh Hogue (Hogue) for $420,000 in September of 1994. Hogue's figure was based on an understanding that the house had "minor" foundation problems.[2]

¶13. McMillan testified that about a month after he moved in, he noticed a cat coming out of a hole in the wall at the southwest corner of the dining room. The Harrisons had not told McMillan about the hole. It took 3.9 cubic yards of dirt to fill the hole. Within a few weeks after moving into the house, he noticed "severe cracking in the wall and the ceiling from the hall at the beginning of the hallway going from the ... den to the master bedroom." When McMillan reported this to Julia, she replied, "Oh, yes, I've had trouble with a beam right there before ..." McMillan testified that he had not been told about the latent problem with the beam and the ceiling before he purchased the home, and it was not noticeable upon a visual inspection of the house.

¶14. McMillan testified that he had experienced numerous problems with the house.[3] A defective gutter caused huge sheets of water to run down the wall when it rained. The wood around a window began to rot. The north wall developed huge cracks. The swimming pool began to sink. The carpet developed a brown stain, a problem the Harrisons had experienced but not disclosed to McMillan. The basin in the fountain leaked.

¶15. Robert Ewing (Ewing) testified that his firm had installed "jacking pads" in 1992 which did not correct the foundation problems. Ewing testified that while installing the "jacking pads" was a less expensive procedure, it was not an adequate remedy to the foundation problems because of the sand fill on which the house sat. Before installing the jacking pads, the firm had recommended helical piers as a permanent solution to the foundation problems. Furthermore, on September 23, 1993, Eddie Bankston of Bankston

Builders had also installed ten foundation support "jacking pads." These did not correct the problem. Ultimately, McMillan hired John Ray (Ray) of Ewing and Ray Foundation Service to install helical piers to stabilize and reinforce the foundation of the house.[4]

## DISCUSSION

### I. Failure to Disclose

¶16. Julia contends that McMillan is precluded from recovery of damages based on her alleged full disclosure of the problems that existed with the house's foundation. To this end, Julia cites two cases in support of her position. In *Cummins v. Century 21 Action Realty, Inc.*, 563 So.2d 1382, 1387 (Miss. 1990), the purchaser was precluded from recovery of damages when he was specifically advised as to the home's termite damage before purchasing the home, and in *Parker v. Thornton*, 596 So.2d 854, 858 (Miss. 1992), this Court stated that a builder complies with the implied warranty of fitness of habitation where he gives notice of the problem and informs the purchasers of the problems.

¶17. Julia argues that McMillan admitted that he knew that there was foundation problems with the house and a possibility of future foundation problems. McMillan and the Harrisons negotiated a Removal of Sales Contingencies Contract which is a part of the Contract of Sale. The parties agreed to have $2,000 held in escrow for future foundation repairs, if needed. McMillan also hired his own experts to examine the home before closing. Richard Berry, P.E., was hired by McMillan to inspect the foundation, and McMillan received the report from Jermany Miller, P.E., before the closing. Julia contends that even taking all the evidence in the light most favorable to McMillan, she should have been granted a judgment in her favor as a matter of law.

¶18. At trial, McMillan testified that at least 90 percent of his decision to purchase the home was based on the assurances made by the Harrisons. According to McMillan's testimony, he would have never purchased the house if he had known of its true condition. The record reflects that McMillan did know about some of the problems with the foundation. McMillan also had retained experts to examine the home before its purchase. McMillan also agreed to fix the damages or cost of future repairs at the amount of $2,000, to be held in escrow.[5] However, the record further reflects that McMillan was supplied information that the home had "minor" foundation problems and that the problem had been fixed. Therefore, McMillan contends that he was never fully advised of the true condition of the home, thereby, providing him with a false sense of security.

¶19. McMillan contends that he was unaware of the following defects in the house and its foundation:

1. On the Disclosure Statement, the Harrisons characterized the foundation problems as "minor." At her pre-trial deposition, Julia also admitted that the settlement that the house had experienced "was pretty major to me."

2. On April 9, 1992, Ladner Testing Laboratories performed soil compaction tests on the north side and northeast corner of the dwelling, and reported substandard density readings of 88.1% and 86.0%. The minimum acceptable is 95% density. McMillan was never told this.

3. The Harrisons did not tell McMillan that Ewing Foundation Services had inspected the house in the summer of 1992, assessed the problem and proposed foundation repairs ranging from $15,000 to almost $19,000. Ewing recommended the installation of helical piers to support and reinforce the

foundation. The Harrisons opted for jacking pads, a less costly option, with no success. Later, McMillan had to have helical piers installed, at great expense to himself.

4. Prior to closing, the Harrisons told McMillan that "a soil test had been done and there was no Yazoo clay near the surface." In fact, Yazoo clay soils were present within two and a half to three and a half feet of the surface, directly beneath the foundation and near the critical retaining wall area. Proper site preparation requires "at least seven feet of nonexpansive soils over the top of the Yazoo clay." Geotechnical engineer David Dennis explained at trial and at the Rule 60(b)(6) hearing that the soft sandy clays in this area are "very weak and highly compressible." "[A]ny foundation placed on top of those type soils or just above those type soils would experience excessive settlement and cracking."

¶20. Mississippi appellate practice requires that "[i]n a civil jury case, a post-trial motion for judgment notwithstanding the verdict is necessary for appellate review if the appellant wishes to contend that judgment should have been granted as a matter of law." Luther T. Munford, *Mississippi Appellate Practice* § 3.5, at 3-10 (1997). A post-trial motion challenging the sufficiency of the evidence must be filed within 10 days after entry of judgment on a jury verdict. M.R.C.P. 50(b); *New Hampshire Ins. Co. v. Sid Smith & Assocs., Inc.*, 610 So.2d 340, 344 (Miss. 1992). M.R.C.P. 50(b) provides the time in which a motion for J.N.O.V. must be procedurally filed. Rule 50(b) states:

> **Motion for Judgment Notwithstanding the Verdict.** Not later than ten days after entry of judgment in accordance with a verdict, a party may file a motion to have the verdict and any judgment entered thereon set aside; or if a verdict was not returned, a party, within ten days after the jury has been discharged, may file a motion for judgment. If no verdict was returned the court may direct the entry of judgment or may order a new trial.

¶21. Here, Julia filed a timely post-trial motion styled as a motion for a new trial. However, McMillan contends that the motion for new trial failed to preserve any specific alleged error regarding the legal sufficiency of the evidence supporting McMillan's verdict in order to support a claim for J.N.O.V. Julia's post-trial motion specifically sought a remittitur or, in the alternative, a new trial on liability and damages. A motion for J.N.O.V. or a directed verdict must set out specific, not general, facts that demonstrate a failure to establish a prima facie case. *Sheffield v. State*, 749 So.2d 123, 126 (Miss. 1999); *see Hicks v. State*, 812 So.2d 179, 195 (Miss. 2002). The Harrisons' motion for new trial stated:

Motion for New Trial

> COMES NOW the [d]efendants, Neil R. Harrison and Julia A. Harrison, through counsel, and pursuant to Rule 59 (a) and § 11-1-55 of the Mississippi Code of 1972 [a]nnotated and [r]ecompiled, and moves this court for a remittitur or in the alternative a new trial on liability and damages and would show unto the [c]ourt the following matters and facts to wit:

> 1. That the jury verdict in the amount of $290,000.68 is so excessive for the reason that the jury as the trier of facts was influenced either by bias, prejudice or passion in that the damages awarded were contrary to the overwhelming weight of credible evidence.

> 2. The [c]ourt erred in allowing the [pl]aintiff to testify as to the cost of repairs of the [p]laintiff's home when it was not shown through credible evidence that the repair, if any, was reasonable and

necessary.

> 3. The [c]ourt erred in allowing attorney's fees as part of the [p]laintiff's damages.

> 4. The [c]ourt erred in not granting a directed verdict for the [d]efendants at the end of the [p]laintiffs case.

> 5. The jury verdict was contrary to the overwhelming weight of credible evidence and not supported by the law nor the evidence.

> 6. The [c]ourt erred in allowing the [p]laintiff's [i]nterrogatory [j]ury [i]nstructions.

> 7. The [c]ourt erred in allowing the [p]laintiff's [j]ury [i]nstructions in the form of a verdict against both [d]efendants as joint tort feasors contract to § 85-5-7 of the Mississippi Code of 1972 and for other grounds to be heard on the hearing hereof.

> Wherefore, premises considered, the [d]efendants, Neil R. Harrison and Julia A. Harrison, move this [c]ourt for a remittitur or in the alternative a new trial on liability and damages.

¶22. When a trial judge's refusal to grant J.N.O.V. is appealed to this Court, we must examine all of the evidence, not just evidence supporting the non-movant's case, in the light most favorable to the party opposing the motion. *Hamilton v. Hammons*, 792 So.2d 956, 964 (Miss. 2001); *see C & C Trucking Co. v. Smith*, 612 So.2d 1092, 1098 (Miss. 1992). In *C & C Trucking Co.*, this Court stated:

> It is only when a directed verdict at the close of the plaintiff's case and again at the close of the defendant's case, would have been proper that a judgment notwithstanding the verdict is proper. Such is not the standard where the trial court is required to use its discretion in granting a motion for a new trial. The variance in proof needed to support these motions is easily explained when one recognizes that a JNOV terminates the case, whereas a new trial simply gives both parties the opportunity to relitigate the controversy.

*Id*. at 1098-99. Therefore, reviewing the post-trial motion for new trial, this Court concludes that Julia is now procedurally barred from requesting this Court to review the legal sufficiency of the evidence on appeal as the Harrisons sought a new trial and not a J.N.O.V. However, this Court will briefly review the evidence supporting the denial of the Harrisons' request for directed verdict.

¶23. On appeal, "the standard of review for denial of a judgment not withstanding the verdict (J.N.O.V.) and a directed verdict are identical." *American Fire Protection, Inc. v. Lewis*, 653 So.2d 1387, 1390 (Miss. 1995). *See Sperry-New Holland v. Prestage*, 617 So.2d 248, 252 (Miss. 1993). Whether to grant a directed verdict is a decision of law. *Fox v. Smith*, 594 So.2d 596, 603 (Miss. 1992). M.R.C.P. 50 (a) provides:

> **Motion for Directed Verdict: When Made; Effect.** A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted without having reserved the right to do so and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the *specific grounds* thereof. The order of the court granting a motion for a directed verdict is

effective without any assent of the jury.

(emphasis added).

¶24. In *McKinzie v. Coon*, 656 So.2d 134, 137 (Miss. 1995), this Court stated:

> Miss.R.Civ.P. 50 requires the trial court to take a case from a jury and grant a directed verdict if any verdict other than the one directed would be erroneous as a matter of law. The comment to the Rule instructs the trial court to look 'solely to the testimony on behalf of the opposing party; if such testimony, along with all reasonable inferences which can be drawn therefrom, could support a verdict for that party, the case should not be taken from the jury.' *Kussman v. V & G Welding Supply, Inc.*, 585 So.2d 700, 702 (Miss. 1991). In considering a motion for a directed verdict, this Court must consider whether the 'evidence in opposition to the motion was of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment could differ as to the verdict.' If so, the motion must be denied and the verdict will stand. *Collins v. Ringwald*, 502 So.2d 677, 678 (Miss. 1987). If, however, the evidence is so overwhelmingly in favor of the appellant that reasonable persons could not have reached a different verdict, this Court must reverse. *Strong v. Nicholson*, 580 So.2d 1288, 1292 (Miss. 1991).

¶25. This Court finds that this issue is without merit. Based upon a careful review of the record and the numerous facts in dispute at trial, this Court finds no error in the trial court's denial of the Harrisons' request for directed verdict.

## II. Damages

¶26. The Harrisons challenge the award of damages for emotional distress, attorneys' fees, and damages to the realty.

### A. Emotional Distress

¶27. The Harrisons argue that the trial court erred by admitting evidence of emotional distress. The standard of review for either the admission or exclusion of evidence is abuse of discretion. *Floyd v. City of Crystal Springs*, 749 So.2d 110, 113 (Miss. 1999). This Court will not reverse an erroneous admission or exclusion of evidence unless the error adversely affects a substantial right of a party. *Id*. *See also Thompson Mach. Commerce Corp. v. Wallace*, 687 So.2d 149, 152 (Miss.1997); *In re Estate of Mask*, 703 So.2d 852, 859 (Miss.1997); *Terrain Enters., Inc. v. Mockbee*, 654 So.2d 1122, 1131 (Miss.1995).

¶28. Julia claims plain error occurred and cites *Morrison v. Means*, 680 So.2d 803,807 (Miss. 1996) and *Strickland v. Rossini*, 589 So.2d 1268, 1276 (Miss. 1991) for authority. Both of these cases discuss recovery for emotional distress.

¶29. McMillan testified at length about the condition of the house. Due to the exorbitant costs of the repairs, McMillan and his wife decided to do some of the work themselves. McMillan further testified that he has diabetes. The diabetes can be controlled if McMillan maintains a diet and exercises regularly. As a result of the repairs in the home, he was not able to use his exercise equipment. Also, he was not able to maintain his schedule or diet, he experienced stress and his blood sugar increased. McMillan testified that he became so exhausted that the room started to spin. He went to see his doctor. The doctor thought that McMillan most

likely was suffering from a viral inner ear infection associated with the exhaustion.

¶30. The case sub judice is distinguishable from the authority cited by the Harrisons. First, McMillan testified to physical conditions suffered during the time of repair work. The testimony did not concern emotional distress. Second, McMillan was seen by a doctor who determined the physical ailment from which McMillan suffered. Third, the trial court has the discretion to either admit or exclude evidence. Unless a substantial right of a party is adversely affected, this Court will not reverse the admission or exclusion of evidence. The trial court overruled the Harrisons' objection of the admission of testimony and allowed counsel for McMillan to lay a foundation. Lastly, the jury verdict did not break down the award of damages. Instead, the jury returned a verdict that stated, "We, the jury, find for the Plaintiff, Fred McMillan, and award him compensatory damages in the sum of $290,066.84." Therefore, this Court cannot say with certainty what amount, if any, was awarded to McMillan for any emotional or physical harm suffered. This issue is without merit.

### B. Attorneys' Fees

¶31. Julia next complains that attorneys' fees were not a recoverable item of damages in this case. Julia argues on appeal that there was no statutory authority or contractual provision allowing recovery of the fees. She also objects to the jury instruction on attorneys' fees.

¶32. " 'A trial court's decision on attorneys' fees is subject to the abuse of discretion standard of review.'" *Sentinel Indust. Contracting Corp. v. Kimmins Indust. Serv. Corp.*, 743 So.2d 954, 970-71(Miss. 1999)(quoting *Bank of Miss. v. Southern Mem'l Park, Inc.*, 677 So.2d 186, 191 (Miss.1996)). This Court has held that "[i]n breach of contract cases, attorney fees generally are not awarded absent provision for such in the contract or a finding of conduct so outrageous as to support an award of punitive damages." *Garner v. Hickman*, 733 So.2d 191, 198 (Miss. 1999).

¶33. McMillan disputes Julia's claim that there was no contractual provisions for attorneys' fees. McMillan and the Harrisons entered into a contract for the purchase of real estate on October 6, 1994. This contract provided for recovery of attorneys' fees in the event of a breach of contract. In specific, the contract stated the following:

> If it becomes necessary to insure the performance of conditions of this contract for either party to hire legal counsel, then the defaulting party agrees to pay reasonable attorney's fees and costs in connection therewith.

In addition, an "agreement for removal of sales contract contingencies" was signed on October 11, 1994. The pertinent attorneys' fee provision in that agreement stated:

> In the event either party hereto fails to adhere to and/or comply in good faith with the terms and provisions herein contained, that party shall pay the attorneys' fees and costs associated with the other party's enforcement of the terms hereof.

¶34. Here, the jury was requested to answer specific questions. The jury determined that based on a preponderance of the evidence Julia and Neil (1) breached the provision of their contract with McMillan in which they represented that they were not aware of any foundation, or drainage problems on the property and that they were not aware of any visible or hidden defects, except those disclosed a the time of the closing; (2) breached their implied warranty to construct the house in a workmanlike manner suitable for

habitation; and (3) were negligent in that they failed to use a reasonable degree of care, skill and experience in the construction of the house. The jury, however, did not find that Julia or Neil committed a fraud or misrepresentation in their dealings with McMillan.

¶35. In addition, Julia complains about the jury instruction allowed by the trial court. She contends that the trial court had a duty to "weed out" the claim for attorney fees as they were not warranted under statute or contract. Julia states that the jury instructions were objected to at trial.

¶36. No specific jury instruction is identified on appeal. Presumably, Julia is referring to jury instruction number 8. This instruction reads as follows:

> The Court instructs the jury that Julia and Neil Harrison and Fred McMillan entered into a contract for the purchase of the house at 137 Overlook Pointe and that as part of that contract Julia and Neil Harrison made the contractual promise that they were not aware of any foundation or drainage problems with the property at 137 Overlook Pointe and that there were no defects, hidden or otherwise, known to them which were not disclosed either in the sales contract or the disclosure statement. If you believe from a preponderance of the evidence that Julia Harrison or Neil Harrison broke this promise by concealing of failing to disclose hidden defects, such as problems with the soil conditions underlying the house, then they breached the contract and your verdict should be in favor of the Plaintiff, Fred McMillan, on this point. If you further find that the breach of contract caused loss to Fred McMillan, **then he is entitled to recover from the Defendant all foreseeable losses caused by the breach of contract as well as attorney's fees for the cost of this litigation**.

(emphasis added). This Court has held in *Wallace v. Thornton*, 672 So.2d 724, 728 (Miss. 1996) that:

> On appeal, we do not review jury instructions in isolation; rather, they are read as a whole to determine if the jury was properly instructed. *People's Bank and Trust Co. v. Cermack*, 658 So.2d 1352, 1356 (Miss.1995); *Burton v. Barnett*, 615 So.2d 580, 583 (Miss.1993); *Payne v. Rain Forest Nurseries, Inc.*, 540 So.2d 35, 40 (Miss.1989); *Byrd v. F-S Prestress, Inc.*, 464 So.2d 63, 66 (Miss.1985). Therefore, defects in specific instructions do not require reversal "where all instructions taken as a whole fairly--although not perfectly--announce the applicable primary rules of law." *Burton*, 615 So.2d at 583. However, if those instructions do not fairly or adequately instruct the jury, this Court can and will reverse. *Id*. We do not make much comment on this except to say that it appears to be an abstract instruction and may be acceptable if other instructions adequately cover it.

¶37. Clearly, the jury found that the Harrisons breached their contract with McMillan. McMillan provided evidence of legal fees at trial which were incurred as a result of the alleged breach of contract. The attorney's fees would therefore be appropriate in the case sub judice. The contract and the agreement for removal of sales contract contingencies both had provisions for recovery of attorney's fees. The jury found a breach of contract. Pursuant to the above cited case law and after reviewing the jury instructions as a whole, this Court finds that the trial court was well within its authority to allow recovery of attorneys' fees and did not abuse its discretion.

### C. Damages to Realty

¶38. Julia argues that the method for calculating damages to the realty can either be the cost of repair <u>or</u> the

difference in the value of the property before and after the damage. She maintains, however, that both methods cannot be used together. Julia contends that the trial court erred by allowing the jury to pyramid the damages by using (1) the house's appraised market value on the date of sale and after the repairs had been made and (2) the cost of the repairs. In particular, she complains that jury instructions P-6 (a.k.a Instruction 8) and P-8 (a.k.a. Instruction 6) allowed the jury to assess <u>all losses</u> sustained by McMillan without a guide as to the elements of damage. Jury instruction 6 reads as follows:

Jury instruction 6

The Court instructs the jury that one who falsely represents, by silence or affirmative statement, a past or present material fact, with knowledge of its falsity or with reckless disregard as to whether it is true or false and intends by that representation to deceive another, who relies on it without knowing that it is false, has committed fraud and is liable to the person who relied on the false statement and was injured as a consequence of the misrepresentation. The law refers to this as fraud or misrepresentation. Unlike other means of recovery outlined for you in these instructions, fraud and misrepresentation must be proved by clear and convincing evidence, which is more than a preponderance of the evidence. Thus, if you find from the clear and convincing evidence in this case that 1) the Defendants Julia and Neil Harrison falsely represented to Fred McMillan the condition of the subsoil <u>or</u> the condition of the house at 137 Overlook Pointe; and 2) you further find that Julia and Neil Harrison <u>either</u> knew their representations were false or acted in reckless disregard as to whether they ere true or false; and 3) you further find that Julia and Neil Harrison intended to deceive Fred McMillan by means of their representations in order to sell him the house at 137 Overlook Pointe; and 4) that Fred McMillan was unaware of the falsity of the representations made by Julia and Neil Harrison; and 5) you further find that Fred McMillan reasonably relied upon Julia and Neil Harrison's representations; and 6) you find that Fred McMillan sustained a loss as a consequence of his reliance on this representation, then Julia and Neil Harrison committed fraud or misrepresentation and your verdict shall be for the Plaintiff, Fred McMillan. In that event, you shall award a monetary amount as may be required to make him whole for the loss caused to him by Julia and Neil Harrison's fraud or misrepresentation, if any.

As noted in the previous damage issue, the jury was instructed to answer a number of questions, including whether the Harrisons committed fraud or misrepresentation. As to the allegation of fraud or misrepresentation, the jury found that the Harrisons were not at fault; and therefore, the verdict was rendered in favor of the Harrisons on that point. Since the jury found in the Harrisons' favor regarding the allegation of fraud, we find no merit to the assertion that the jury was allowed to assess all losses sustained to McMillan without guidance of the elements of damage.

¶39. The next instruction at issue is jury instruction 8 (a.k.a. P-6). This instruction is quoted in its entirety in the previous attorneys' fee damage issue above. The instruction dealt with a breach of contract and stated in part: "[I]f you further find that the breach of contract caused loss to Fred McMillan, **then he is entitled to recover from the Defendant all foreseeable losses caused by the breach of contract as well as attorney's fees for the cost of this litigation**." (emphasis added). There was no objection on the grounds of guidance as to the elements of damages. There was a discussion on whether there was testimony concerning flooding. However, there was no mention of how the jury should assess losses in the form of damages.

¶40. This Court has addressed the issue of an objection based upon different grounds on appeal than that stated in the trial court. "[O]n appeal a party may not argue that an instruction was erroneous for a reason other than the reason assigned on objection to the instruction at trial." *Young v. Robinson*, 538 So.2d 781, 783 (Miss. 1989). *See also [Dixie Ins. Co. v. Mooneyhan](#)*, 684 So.2d 574, 589 (Miss. 1996). Accordingly, this issue is waived.

¶41. Notwithstanding this conclusion, a review of the law and jury instruction 13 is helpful. While not specifically mentioned by Julia in the appeal, Jury instruction 13 (a.k.a. P-10) addresses the recovery of damages for restoration of the property. The instruction states the following:

Jury Instruction No. 13

If you find from a preponderance of the evidence in this case that repairs to 138 Overlook Pointe have or will substantially restore the property to its condition prior to its damage, then Fred McMillan's recovery for damage to 137 Overlook Pointe is the difference between the reasonable market value of that property before the damage and the reasonable market value of he property after being damaged. This difference is determined as follows:

1. If repairs restore the property at 137 Overlook Pointe to its **reasonable market value before damage**, Plaintiff's recovery for **damage** to that property would be his **cost** of reasonable and necessary repairs.

2. However, **if repairs do not restore the property** at 137 Overlook Pointe **to its reasonable market value before the harm**, Plaintiff's recovery for **damages** to the property at 137 Overlook Pointe is the **reasonable cost to repair that property <u>plus</u> the difference between the reasonable market value** of 137 Overlook Pointe **without the damage less the reasonable market value of the property after all reasonable and necessary repairs have been made**.

(emphasis added).

¶42. To clarify this issue, Julia asserts that the calculation for damage to realty must be determined either by the cost of the repairs or the value of the property before the damage and after the damage. She relies on *Chevron Oil Co. v. Snellgrove*, 253 Miss. 356, 175 So.2d 471, 474 (1965)(trespass action involving seismic exploration and alleged damage to trees); *R&S Dev., Inc. v. Wilson*, 534 So.2d 1008, 1012, 1013 (Miss. 1988)(title action and alleged damage to an alleyway), and *System Fuels, Inc. v. Barnes*, 363 So.2d 747, 749-50 (Miss. 1978)(alleged damage to trees on property when pipeline was placed on property) for authority. Here, McMillan's case is based upon claims of breach of contract, breach of implied warranty and negligence and not solely damage to property. This case is somewhat unique in that testimony showed that the house had problems, repairs were undertaken, however, despite the cost of repairs, the fair market value was far below the price of a similar home without any damage.

¶43. This Court set forth the rules to determine damages in *Bynum v. Mandrel Industries, Inc.*, 241 So.2d 629, 634 (Miss. 1970)(damage to a pond on the property) as follows:

In the case of *Chevron Oil Company v. Snellgrove*, 253 Miss. 356, 175 So.2d 471 (1965), we had this to say with reference to the method of proving damages to real estate:

As a general rule the measure of damages in actions for permanent injury to land where there is no

willful trespass is the difference in value in the before-and-after damage to the premises. We have called attention to this rule repeatedly. *Waggener v. Leggett*, 246 Miss. 505, 150 So.2d 529 (1963); *Union Producing Co. v. Pittman*, 245 Miss. 427, 146 So.2d 553 (1962). See also 87 C.J.S. Trespass s 117 (1954). It is also true that where the land, or buildings located on the property, has been damaged but the property may be restored to its former condition at a [cost] less than the value determine by the diminution of the value of the land, the cost of restoration of the property, plus compensation for the loss of its use, may be the measure of damages. *Mississippi Power Co. v. Harrison*, 247 Miss. 400, 152 So.2d 892 (1963); *Copiah Dairies, Inc. v. Addkison*, 247 Miss. 327, 153 So.2d 689 (1963); *Broadhead v. Gatlin*, 243 Miss. 386, 137 So.2d 909 (1962); *Long v. Magnolia Hotel Co.*, 236 Miss. 655, 111 So.2d 645, sugg. of error 114 So.2d 667 (1959); *Sears, Roebuck & Co. v. Creekmore*, 199 Miss. 48, 23 So.2d 250 (1945); *Yorkshire Ins. Co. v. Brewer*, 175 Miss. 538, 166 So. 361 (1936); *Bowyer & Johnson Const. Co. v. White*, 5 Cir., 255 F.2d 482 (1958). This rule, however, is usually confined to the introduction of evidence to show a reduction, and not an increase, of damages above the diminution in value of the land resulting from the injury. * * * (253 Miss. at 364, 175 So.2d at 474).

We said in *Sun Oil Company v. Nunnery*, 251 Miss. 631, 170 So.2d 24 (1964), if the damage to the land is permanent, the measure thereof is usually the difference between the fair market value of the entire tract before the injury and the fair market value after the injury. Citing *Baker v. Miss. State Highway Commission*, 204 Miss. 166, 37 So.2d 169 (1948).

The Court in *Bynum* further stated the following:

[T]he 'before and after rule,' is not a hard and fast or inflexible rule applicable under all circumstances, and it will not apply where there is a more definite, equitable, and accurate way by which the damages may be determined. Where the thing which is destroyed or injured, although a part of, or attached to, the realty, has a distinct value without reference to the realty on which it stands or from which it grows, the recovery is for the value or depreciation of value of the thing destroyed or injured, and not for the difference in the value of the land before and after the destruction; the recovery may be the value of the thing destroyed or the cost of its repair.

*Bynum*, 241 So.2d at 634-35.

¶44. In *Gerodetti v. Broadacres, Inc.*, 363 So.2d 265, 267-68 (Miss. 1987), a construction contract suit involving damages for incomplete performance, this Court held in part:

Where a building is completed, substantially according to plans and specifications, the measure of damages [FN1] may be determined by: (1) the cost rule which is the cost of repairing the defects to make the building or structure conform to the specifications where such may be done at a reasonable expense if unreasonable economic waste is not involved, or (2) the diminished value rule which is the difference in the value of the property with the defective work and what the value would have been if there had been strict compliance with the contract. The diminished value rule applies where the defects cannot be remedied without great sacrifice of work or material or would impair the building, or would involve unreasonable economic waste, or where the defects cannot be repaired at a reasonable cost, or where it is not reasonable or practicable to remedy the defects, or where the cost of remedying the defects will not fully compensate the owner for damages suffered by him. 25 C.J.S. Damages s 76, pp. 859-864 (1966); 76 A.L.R.2d 792 (1961).

FN1. Our discussion of damages in this case is limited to the "cost" rule and the "diminished value rule" and does not include other damages which might accrue as a result of failure of a builder to construct a building in substantial compliance with his contract.

¶45. Hugh Hogue (Hogue), a certified appraiser, testified that if the house was properly constructed the current 1997 value would be $460,000. However, Hogue also testified that the value of the house on 137 Overlook Pointe with repairs was only $393,000. These figures show that there is a difference in value of $67,000 between the same house with no damage as compared to McMillan's house with the defects. Therefore, even with the repairs of approximately $174,000, McMillan still suffered a $67,000.00 loss in the value of his house.

¶46. McMillan argues that the instruction based upon model instructions and that general contract and negligent principles are also at issue. When negligent construction and breach of contract occurs, a party is entitled to recover damages amounts that reasonably place the party in the same position it would have had but for the negligence and breach. *See Frierson v. Delta Outdoor, Inc.,* 794 So.2d 220, 225 (Miss. 2001); *Fred's Stores of Miss., Inc. v. M & H Drugs, Inc.,* 725 So.2d 902, 918 (Miss. 1998).

¶47. In *Gerodetti*, this Court held:

In *Bevis Construction Company v. Kittrell*, 243 Miss. 549, 139 So.2d 375 (1962) we addressed the question of the measure of damages involving substantial compliance of a building contract and held:

The chancery court should have awarded damages to appellees for the failure of the Bevis Construction Company to carry out its agreement with them in a sum sufficient to furnish the construction of the building; or a sum sufficient to bring the building up to the specifications of the contract and agreement between the parties, **together with such other damages due them as was shown to have grown directly out of the failure of the Bevis Construction Company to carry out its contract and understanding.**

\* \* \* \*

Although *Bevis* did not specifically mention the diminished value rule, damages for substituting painted sills and floor joists for creosoted sills and floor joists would be measured by this rule. *Bevis* **allowed as damages cost of completion, costs of remedying defects, and diminished value, and is therefore authority for applying the "cost" rule to some defects and the "diminished value rule" to others.**

Plaintiff charges numerous defects, some of which were remedied by the plaintiff at a reasonable cost, some of which were remedied by the defendant and some of which cannot be remedied without great economic waste.

We are of the opinion that, because of the nature of defects involved, on retrial the cost rule may be applied to some and the diminished value rule to others. We do not undertake to advise the trial court specifically which rule to apply to particular defects because we do not know what the evidence will show on retrial.

This will not prevent defendants from obtaining an instruction that damages for any defect resulting from the architect's design of the buildings are not recoverable, and that plaintiff may not recover for any defects resulting from any alteration from the original plans and specifications where such change was acquiesced in, and the finished work accepted by the plaintiff, if there is evidence of these factors at the new trial. Defendant will also be entitled to the instruction granted at the first trial pertaining to the duty of plaintiff to minimize its damages.

*Gerodetti*, 363 So.2d at 268-69 (emphasis added). Clearly, the cost rule and diminished value rules can both apply in the assessment of damages. *See Gerodetti*, 363 So.2d at 269 (citing **Bevis Constr. Co. v. Kittrell**, 243 Miss. 549, 139 So.2d 375, 380 (1962).

¶48. Here, the jury was instructed that if the repairs restored the property to the reasonable fair market value *before* damage, then McMillan was entitled to recover the cost of his reasonable and necessary repairs. However, if repairs did not restore the property to its reasonable market value before the harm, McMillan was entitled to recover the reasonable cost to repair that property plus the difference between the reasonable market value of the property without the damage less the reasonable market value of the property after all reasonable and necessary repairs were made. Again, the jury found for McMillan on the breach of contract, breach of implied warranty and negligence allegations. Hogue testified that even with the repairs, the house could not achieve its fair market value. The instruction was correct, and case law does allow a combination of recovery for cost of repairs and diminution in value when supported by the evidence. Case law also provides for recovery of other damages resulting from or growing out of a failure to fulfill a contract. *Gerodetti*, 363 So.2d at 268-69 (citing **Bevis Constr. Co. v. Kittrell**, 243 Miss. 549, 139 So.2d 375, 380 (1962)). There was no pyramiding of damages, and the testimony supported the jury finding and verdict. Accordingly, this Court finds that this issue is without merit.

### III. Rule 60(b)(6) Motion

¶49. Julia next complains that the trial court abused its discretion in not considering the effect of Miss. Code Ann. § 85-5-7 (1999),[6] on joint tortfeasor liability. The motion was brought pursuant to Rule 60(b)(6).[7] Julia contends that an eight (8) inch sanitary sewer line underneath the McMillan house proximately contributed to the damages claimed. Further, Julia argues that she and her husband, Neil were unaware of the problem, the evidence was relevant and was not discoverable by reasonable diligence prior to the expiration of six (6) months after the trial. Even if liability is found, Julia requests the opportunity to present the evidence at a new trial.

¶50. Final judgment in the case sub judice was entered on January 20, 1998. On March 6, 1998, the trial court denied the Harrisons', motion for new trial. On September 8, 2000, the Harrisons filed a motion for relief from judgment pursuant to M.R.C.P. 60(b)(6). The trial judge denied the motion on April 16, 2001. The April 16 order incorporated by reference, the trial court's opinion, which was part of the hearing transcript.

¶51. This Court has held that "[w]e will reverse the grant or denial of a Rule 60(b) motion only upon a showing of abuse of discretion." *Moore v. Jacobs*, 752 So.2d 1013, 1015 (Miss. 1999)(footnote & citations omitted). *See also Briney v. United States Fid. & Guar. Co.*, 714 So.2d 962, 966 (Miss. 1998). This Court further held that "[w]hen ruling upon Rule 60(b) motions, ... a balance must be struck between granting a litigant a hearing on the merits with the need and desire to achieve finality in litigation.... [A] party is not entitled to relief merely because he is unhappy with the judgment, but he must make some

showing that he was justified in failing to avoid mistake or inadvertence; gross negligence, ignorance of the rules, or ignorance of the law is not enough." *Id*. (citing *Stringfellow v. Stringfellow*, 451 So.2d 219, 221 (Miss. 1984)).

¶52. "Relief under Rule 60(b)(6) is reserved for extraordinary and compelling circumstances." *Briney*, 714 So.2d at 966. This Court has described "this catch-all [Rule 60(b)(6)] as a 'grand reservoir of equitable power to do justice in a particular case....'" *Id*. (citing *Burkett v. Burkett*, 537 So.2d 443, 445 (Miss.1989)(quoting *Bryant, Inc. v. Walters*, 493 So.2d 933, 939 (Miss.1986)). "Only in cases inhering 'extraordinary circumstances' will this Court conclude that the balance of equities tilts in favor of the movant."*Lose v. Ill. Cent. Gulf R.R.*, 584 So.2d 1284,1286 (Miss. 1991).

¶53. In the case sub judice, the trial judge listened to the testimony presented by the parties and determined that the motion should be denied. The Harrisons brought the motion under Rule 60(b)(6). However, the trial judge analyzed the motion within the context of the evidence provided during the hearing and by analyzing Rule 60(b)(6) the general catch all section and Rule 60(b)(3) which addresses newly discovered evidence which could not be discovered by due diligence in the requisite time to move for a new trial under Rule 59(b). When making the determination, the trial judge considered case law, balanced the equities, reviewed the diligence of the parties, and considered other potential tortfeasors.

¶54. The trial judge stated a number of reasons for denying the motions:

> If Mrs. Harrison and Mr. Harrison exercised due diligence, then it looks to me like they have a claim possibly against some other parties, but that shouldn't affect Dr. McMillan's position in this case. When you look at due diligence in that regard, you consider a lot of things, Mrs. Harrison was the builder of that house. Should she have gone and looked for this old plat once- you know, do you ever go and look behind a plat after you get your title search and your engineer has presented you with a plat? I don't know. Sometimes you do; sometimes you don't I guess. It depends on the circumstances. I can see where there could be fraud, misrepresentation, negligence on the part of sellers, developers. The list just goes on and on. But that wasn't Dr. McMillan's issue to bring to court. If it were going to be brought in this lawsuit, it should have been brought in by Mr. and Mrs. Harrison.

¶55. The trial judge also noted that the testimony boiled down to a battle of the experts over whether there was adequate backfill and various issues involving the sewer line. In addition, the trial judge continued to rely on a balance of equities. He considered whether McMillan, after being successful in the trial, should be brought back into litigation with the Harrisons and other potential litigants, such as engineers. Along with these considerations, the trial judge also addressed the additional costs McMillan would incur with a new trial, a possible bar by statutes of limitations, privity, delay in judgment, the appeal process, and finality of litigation. The trial judge weighed all the issues and determined that McMillan would be more prejudiced by further litigation than the Harrisons; and therefore, he ruled in McMillan's favor.

¶56. The trial court listened to the testimony and balanced the equities in the case. This Court will overturn a trial court ruling for abuse of discretion. *Moore,* 752 So.2d at 1015. The trial judge carefully considered the testimony, balanced the equities and found in favor of McMillan. The trial court more than adequately considered all aspects of the Rule 60(b) motion, both in terms of an analysis under Rule 60(b)(3) and Rule 60(b)(6). The facts of this case do not present "extraordinary circumstances" and this Court finds that the balance of equities tilts in favor of the McMillan. There is no merit to Julia's contention that the trial court

abused its discretion.

## CONCLUSION

¶57. For these reasons, the trial court's judgment and its order denying relief from the judgment are affirmed.

¶58. **AFFIRMED.**

 **PITTMAN, C.J., McRAE AND SMITH, P.JJ., COBB, DIAZ, CARLSON AND GRAVES, JJ., CONCUR. WALLER, J., NOT PARTICIPATING.**

1. On January 22, 1999, the trial court determined that the Harrisons had not prosecuted their appeal to this Court. The trial court further found that almost ten months had lapsed since the Harrisons perfected their appeal and more than seven and one-half months had passed since the deadline provided in M.R.A.P. 11 (c), for procuring the filing of the record.

2. On November 11, 1997, Hogue conducted another appraisal lowering his original appraisal to $393,000 based on his subsequent inspection which disclosed more problems with the house than "minor" foundation problems.

3. Photographic exhibits P-61 (a) through 61 (j).

4. Ray's invoice dated October 17, 1997, for work done for McMillan reflected a charge of $17,900.00 for installing the helical piers.

5. Julia further contends that a $60,000 reduction in the price of the house was also negotiated between the parties based on the foundation problems that existed with the house. However, McMillan contests this assertion.

6.

 (1) As used in this section "fault" means an act or omission of a person which is a proximate cause of injury or death to another person or persons, damages to property, tangible or intangible, or economic injury, including but not limited to negligence, malpractice, strict liability, absolute liability or failure to warn. "Fault" shall not include any tort which results from an act or omission committed with a specific wrongful intent.

 (2) Except as may be otherwise provided in subsection (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be joint and several only to the extent necessary for the person suffering injury, death or loss to recover fifty percent (50%) of his recoverable damages.

 (3) Except as otherwise provided in subsections (2) and (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault. In assessing percentages of fault an empl oyer and the employer's employee or a principal and the principal's agent shall be considered as one (1) defendant when the liability of such employer or principal has been caused by the wrongful or negligent act or

omission of the employee or agent.

(4) Any defendant held jointly liable under this section shall have a right of contribution against fellow joint tort-feasors. A defendant shall be held responsible for contribution to other joint tort-feasors only for the percentage of fault assessed to such defendant.

(5) Nothing in this section shall eliminate or diminish any defenses or immunities which currently exist, except as expressly noted herein.

(6) Joint and several liability shall be imposed on all who consciously and deliberately pursue a common plan or design to commit a tortious act, or actively take part in it. Any person held jointly and severally liable under this section shall have a right of contribution from his fellow defendants acting in concert.

(7) In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault.

(8) Nothing in this section shall be construed to create a cause of action. Nothing in this section shall be construed, in any way, to alter the immunity of any person.

7.

(b) Mistakes; Inadvertence; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

(1) fraud, misrepresentation, or other misconduct of an adverse party;

(2) accident or mistake;

(3) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application;

(6) any other reason justifying relief from the judgment.

The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than six months after the judgment, order, or proceeding was entered or taken. A motion under this subdivision does not affect the finality of a judgment or suspend its operation. Leave to make the motion need not be obtained from the appellate court unless the record has been transmitted to the appellate court and the action remains pending therein. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished. The procedure for obtaining any

relief from a judgment shall be by motion as prescribed in these rules or by an independent action and not otherwise.